# EXHIBIT B

Fidelity and Deposit Company of Maryland
v Edward E. Gillen Company et al

13CV1291

Transcript of the Testimony of:

# Patrick Hannigan

May 23, 2017



GRAMANN
REPORTING

*Innovation · Expertise · Integrity*

800.899.7222 • www.GramannReporting.com

MILWAUKEE   414.272.7878 • FAX: 414.272.1806 • 740 North Plankinton Ave, Suite 400, Milwaukee, WI 53203
MADISON   608.268.0435 • FAX: 608.268.0437 • 14 West Mifflin Street, Suite 311, Madison, WI 53703

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF WISCONSIN

 3    FIDELITY AND DEPOSIT COMPANY     )
      OF MARYLAND, a Maryland          )
 4    Corporation,                     )
                 Plaintiff,            )
 5       vs.                           )  No. 13-CV-1291
      EDWARD E. GILLEN COMPANY, a      )
 6    Wisconsin corporation;           )
      GARY A. JACKSON, an              )
 7    individual; JULLANE J.           )
      JACKSON, an individual; and      )
 8    DLH CONSTRUCTION AND             )
      TRUCKING, INC., a Wisconsin      )
 9    corporation,                     )
                 Defendants.           )
10

11           The deposition of PATRICK HANNIGAN,

12    called for examination pursuant to the Rules of

13    Civil Procedure for the United States District

14    Courts pertaining to the taking of depositions,

15    taken before BRENDA S. TANNEHILL, CSR, at

16    180 North Stetson Avenue, Chicago, Illinois, on

17    May 23, 2017 at the hour of 10:42 o'clock a.m.

18

19

20

21

22

23

24    REPORTED BY:  Brenda S. Tannehill, CSR, RPR, CRR

25    LICENSE NO.  084-003336
```

```
 1      APPEARANCES:

 2          SCHUYLER ROCHE & CRISHAM ATTORNEYS

 3          BY MR. CORNELIUS F. RIORDAN

 4          18 North Stetson Avenue, Suite 3700

 5          Chicago, Illinois 60601

 6          (312) 565-8445

 7          criordan@SRCattorneys.com

 8              Representing the Plaintiff;

 9

10          HALLOIN & MURDOCK S.C.

11          BY MR. SCOTT R. HALLOIN

12          839 North Jefferson Street, Suite 503

13          Milwaukee, Wisconsin 53202

14          (414) 732-2424

15          shalloin@halloinmurdock.com

16              Representing the Defendants.

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2   WITNESS                         EXAMINATION

 3   PATRICK HANNIGAN

 4      By Mr. Halloin                    5

 5      By Mr. Riordan                  106

 6

 7

 8                 E X H I B I T S

 9   NUMBER                      MARKED FOR ID

10   Hannigan Deposition

11      Exh. 1                          50

12      Exh. 2                          59

13      Exh. 3                          64

14      Exh. 4                          66

15      Exh. 5                          66

16      Exh. 6                          68

17      Exh. 7                          68

18      Exh. 8                          77

19      Exh. 9                          89

20      Exh. 10                        102

21

22      (Original exhibits were attached to original

23       transcript; copies to transcript copies.)

24

25
```

**Page 4**

1        (Whereupon, the witness was
2           duly sworn.)
3        MR. HALLOIN: Sir, can you please state
4 your name for the record.
5        THE WITNESS: Patrick Hannigan.
6        MR. HALLOIN: And can you spell it,
7 please.
8        THE WITNESS: P-A-T-R-I-C-K,
9 H-A-N-N-I-G-A-N.
10        MR. HALLOIN: I'm going to ask you a
11 personal question, but it's not to pry so I'll
12 just tell you why.
13        I know it's a business dispute, but
14 sometimes these cases sit on the file shelves
15 for years so I always need to have your home
16 address just in case we need to track you down
17 prior to trial at some point.
18        THE WITNESS: 2755 Breckenridge Lane,
19 Naperville, Illinois 60565.
20        MR. HALLOIN: Okay. Now, there was a
21 Fourth Amended Complaint filed in this action by
22 Fidelity and Deposit Company of Maryland last
23 night. Mr. Riordan was kind enough to point out
24 the few paragraphs that were added.
25        Normally, there's a document called a

**Page 5**

1 Rule 26 Disclosure that is filed that says what
2 the witnesses know so I know what to ask you
3 about. You were originally identified as
4 handling the underwriting.
5        Is that still the case, that's what
6 he's being presented to testify about?
7        MR. RIORDAN: Yes. He's not handled
8 any claims.
9        PATRICK HANNIGAN,
10 called as a witness herein, having been first
11 duly sworn, was examined and testified as
12 follows:
13        EXAMINATION
14 BY MR. HALLOIN:
15     Q. Is that true, sir?
16     A. Yes.
17     Q. But you did handle the underwriting
18 with respect to the bond that was issued for the
19 31st Street project; is that correct?
20     A. I was involved, yes.
21     Q. Were you involved in the underwriting
22 of any other bonds?
23        MR. RIORDAN: You mean from Gillen?
24        MR. HALLOIN: Yeah, from Gillen.
25        THE WITNESS: The original underwriting

**Page 6**

1 of the account.
2 BY MR. HALLOIN:
3     Q. Anything else?
4     A. Not really.
5        At the manager level, there would be an
6 underwriter who handles the account, and then I
7 would get involved only on certain obligations.
8     Q. And how about for DLH Construction and
9 Trucking?
10     A. No, I didn't do any bonds for DLH.
11     Q. Okay. Or the original underwriting?
12     A. No.
13     Q. So just Gillen original underwriting
14 and the 31st Street project; is that correct?
15     A. Yes.
16     Q. Any other involvement with Edward E
17 Gillen Company or Edward E. Gillen Marine, LLC?
18     A. No.
19     Q. Any other involvement with DLH
20 Construction and Trucking?
21     A. No.
22     Q. That makes it easier. Now I know what
23 to focus on.
24        I'm going to now ask you a bunch of
25 prying questions so I know a little bit more

**Page 7**

1 about you. I'll make it simple.
2        Can you tell me where you went to high
3 school and then lay out your education from
4 there. Give me the years, the institution and
5 what you studied.
6     A. I graduated 1982, High Point High
7 School in Beltsville, Maryland. I went on to
8 undergraduate at Boston College, graduating in
9 1986.
10     Q. Any other degrees after Boston College?
11     A. No.
12     Q. Do you have any certificates or
13 licensures?
14     A. No.
15     Q. What was your first full-time job after
16 you graduated from Boston College?
17     A. It was with the Fidelity and Deposit
18 Company.
19     Q. Different question, but maybe it's just
20 because I'm wet.
21        What was your first full-time job after
22 you graduated from Boston College?
23     A. I worked for three months, two months
24 at a contracting company but then started with
25 Fidelity. Well, I was looking for a job and

Case 2:13-cv-01291-LA   Filed 01/12/18   Page 6 of 42   Document 155-2

Page 8

1  then started at Fidelity and Deposit Company in
2  August of 1986.
3      Q.  Have you been there ever since?
4      A.  Yes.
5      Q.  You know what?  How old are you?
6      A.  52.
7      Q.  Wow.  I have not had that happen in a
8  long time.
9          So you went right from college and you
10 spent your whole career at one place?
11     A.  Yes.
12     Q.  Great.  Good for you.  That's nice to
13 hear.  I'm just going to have to treat it,
14 though, then you had different jobs because I'm
15 assuming you obtained them because you were promoted along the line if
16 you're still there, too.
17     A.  Yes.
18     Q.  Can you tell me the different titles
19 that you've had, when you obtained them
20 approximately and what your job responsibilities
21 were with each title?
22     A.  I was an underwriter from 1986 to
23 approximately 1994 at which time I became an
24 assistant manager and transferred to Richmond,
25 Virginia.

Page 9

1      Q.  That's a pretty place.  How long were
2  you there?
3      A.  Till 2002.
4      Q.  When you were an underwriter, where
5  were you, Boston?
6      A.  I was in Maryland.
7      Q.  Sorry.  You said that.
8      A.  Columbia, Maryland.
9      Q.  Okay.  What was next?
10     A.  In 2002, I took a managing director
11 position in Toronto, Ontario.  I was there until
12 May of 2005.
13     Q.  And then what?
14     A.  When I repatriated, I went to Chicago,
15 Illinois, senior regional vice president.
16     Q.  Okay.
17     A.  In 2014, I became a territory manager
18 still in Chicago, and in March of 2016, senior
19 vice president, head of Middle Market Contract
20 Surety East.
21     Q.  What is middle market contract surety?
22     A.  Contractors that are not of a national
23 caliber.
24     Q.  Smaller regional contractors?
25     A.  Yes.

Page 10

1      MR. HALLOIN:  Off the record.
2          (Whereupon, a discussion was had
3          off the record.)
4  BY MR. HALLOIN:
5      Q.  The time period I'm interested in would
6  have been when you were the senior regional vice
7  president, I think you said from 2005 to 2014 in
8  Chicago.
9      A.  Correct.
10     Q.  Can you tell me who was above you in
11 the pyramid of authority at F&D at that time?
12 Who was your immediate supervisor?
13     A.  So from 2005?
14     Q.  I'm really focused in on 2008 to 2011
15 who you reported to and then who you supervised.
16     A.  I was trying to recall who was in the
17 chain of command at the time.  I think Jerry
18 Haley.
19     Q.  And what did Mr. Haley do?
20     A.  He was in charge of all the field
21 management and our distribution and regional
22 management.
23     Q.  And who would he have reported to?
24     A.  There was different individuals at that
25 time.

Page 11

1  2008?
2      Q.  Uh-huh.
3      A.  Might have been Dan Riordan maybe.  I'd
4  have to look.  Dan Riordan, Mike Bond.
5      Q.  Any relation to this guy?
6      A.  No.
7      MR. RIORDAN:  At one time centuries
8  ago.
9      MR. HALLOIN:  Not quite sure how that
10 works.
11 BY MR. HALLOIN:
12     Q.  Dan Riordan, Mike Bond, what were their
13 position?
14     A.  They would have been the president of
15 Surety.
16     Q.  Did you supervise anyone?
17     A.  Yes.
18     Q.  Who did you supervise?
19     A.  We're speaking in 2008?
20     Q.  2008 to 2011, and if you want to just
21 tell me a position first and then we can attach
22 names with it.
23          Who would you have generally supervised
24 by position, I guess, would be the --
25     A.  Underwriters.

Case 2:13-cv-01291-LA   Filed 01/12/18   Page 7 of 42   Document 155-2

1　Q. How many were there that you would have
2　supervised?
3　A. So in 2008, I guess it would be about
4　eight.
5　Q. And was that constant through 2011?
6　A. Pretty constant. Maybe up or down one
7　depending on what was going on.
8　Q. For that time period, can you identify
9　the underwriters that you would have supervised,
10　that eight plus or minus one?
11　A. So let's see. Tom Homer and Rick
12　Breckke, Tony Ortman.
13　Q. Tony what?
14　A. Ortman, O-R-T-M-A-N. Chris Joachim,
15　J-O-A-C-H-I-M, Angie Greenslade.
16　Q. Can you spell it?
17　A. G-R-E-E-N-S-L-A-D-E.
18　Q. So we have Tom, Eric, Tony, Chris,
19　Angie?
20　A. Jim Bereshein, B-E-R-E-S-H-E-I-N.
21　　So time lines are going to get a little
22　more difficult. I'm not sure when people were
23　coming and going, but at that time, Justin
24　Burgos, he was probably there at that time.
25　Q. Okay.

1　A. Maggie Weber and Ryan Forniere.
2　Q. F-O-R-N-I-E-R-E?
3　A. Yes.
4　Q. Anybody else?
5　A. That would be about it.
6　Q. Of those identified, did any of them
7　work on underwriting of the bonds to Edward E.
8　Gillen Company either in general or for the 31st
9　Street project?
10　　We'll start with two. I know Tom did
11　and I know that Eric Breckke did.
12　A. Tom and Rick would be the only two.
13　Q. Rick is Eric?
14　A. Rick, Richard Breckke.
15　Q. Oh, okay. Richard. Sorry.
16　　And none of the others?
17　A. No.
18　Q. So that would be true for Tony, Chris,
19　Angie, Jim, Justin, Maggie and Ryan, not
20　involved?
21　A. Correct.
22　Q. How about your supervisors, would any
23　of them have been involved?
24　A. No.
25　Q. So not for Jerry Haley, Dan Riordan or

1　Mike Bond?
2　A. No.
3　Q. So the total people at F&D who would
4　have knowledge of the underwriting of Gillen in
5　general or the 31st Street project would be you,
6　Mr. Homer and Richard Breckke?
7　A. Yes.
8　Q. Now, DLH Construction and Trucking did
9　go through an underwriting process. Do you know
10　anything about that at all?
11　A. No.
12　Q. Do you know who worked on it?
13　A. No.
14　Q. What did you understand to be Tom's
15　role?
16　A. Underwriter.
17　Q. Can you describe in layman's terms what
18　that means?
19　A. Tom markets to agents and contractors
20　to develop business, assesses it for risk
21　profile and extends surety credit to those
22　customers.
23　Q. How about Richard Breckke?
24　A. Does the same responsibilities.
25　Q. As it relates to Gillen either -- well,

1　let's take it first for underwriting in general.
2　　What was Tom and what was Richard's
3　role?
4　A. So the same roles or responsibilities
5　were the same. Tom handled the Brehmer agency
6　and wrote the Gillen account. Rick assumed
7　handling of the account after Tom's departure.
8　Q. When would that have been?
9　A. I think that was mid or late 2009.
10　Q. Are you sure of that date?
11　A. No.
12　Q. We just deposed Tom Homer who gave a
13　different date. Would you defer to --
14　A. Tom would know specifically when he
15　left.
16　Q. It's not that far off, but I believe
17　it's a different year. I don't know if it's
18　important or not. Just some of these little
19　facts, sometimes it's easier just to say, "Hey,
20　are you sure."
21　Q. Okay.
22　Q. But basically, Tom and Richard's
23　responsibilities vis-a-vis the Gillen account
24　would have been the same; is that correct?
25　A. Yes.

**Page 16**

1   Q. Is there a period where they
2 overlapped?
3   A. Not on the account, but they were both
4 in the office, and then Tom departed.
5   Q. Is Eric still working for F&D?
6   A. Rick.
7   Q. Yeah, Rick.
8   A. He's still working for us.
9   Q. What is his position right now?
10   A. So Rick is a senior account executive.
11   Q. Is that a promotion?
12   A. Well, he's an underwriter. There are
13 different titles for underwriters, but he's a
14 senior account executive.
15   Q. Is that considered a better position
16 than what he would have had in 2009?
17   A. I think it's the same.
18   Q. You are really good at this. Have you
19 been deposed before?
20   A. I have.
21   Q. How many times? It's a compliment.
22 It's not intended to be -- it's just when we did
23 Tom last time, too, it was literally he would
24 just answer the question before I would get
25 halfway through.

**Page 17**

1   So I take it you've been deposed
2 before. How many times?
3   A. Two or three.
4   Q. Can you tell me about each one? If
5 it's a personal issue, just say "personal." I
6 don't care.
7   A. Business.
8   Q. All two or three are business?
9   A. Yes.
10   Q. Can you identify for me what they were?
11   A. I think it was twice, once, maybe twice
12 was relative to a home building matter, and then
13 the last one was a witness to a different
14 business matter.
15   Q. Involving F&D?
16   A. No.
17   Q. For home building, was it a personal
18 home?
19   A. No. Business, business model.
20   Q. Were you an expert witness?
21   A. No.
22   Q. A fact witness?
23   A. Part of the facts in underwriting,
24 yeah.
25   Q. Were you a party?

**Page 18**

1   A. As a company representative.
2   Q. Okay. Were you personally a party?
3   A. No.
4   Q. How about for the business matter, the
5 third one, were you a party?
6   A. No.
7   Q. Fact witness?
8   A. Yes.
9   Q. Okay. Have you worked with Mr. Riordan
10 before?
11   A. Yes.
12   Q. On any litigated matters?
13   A. I guess yes.
14   Q. How many?
15   A. The ones I would have been deposed on.
16    What is a litigated matter?
17   Q. Where there's a claim or a lawsuit
18 filed.
19    Fair question.
20   A. Yeah, I don't know how many.
21   Q. More than five?
22   A. Probably, yes.
23   Q. Okay.
24    MR. HALLOIN: I don't want to futz with
25 privilege matters. Is he your privilege contact

**Page 19**

1 here, your reporting contact?
2    MR. RIORDAN: He's one of them.
3 Because there's underwriting issues associated
4 with this situation, for the claims matters, I
5 report to Greg, and for underwriting issues, I
6 talk to Pat. Pat and I have talked about 31st
7 Street since it first came up.
8    MR. HALLOIN: Would Harry have, or is
9 it just you?
10    MR. RIORDAN: Harry did, too.
11    MR. HALLOIN: I'm asking just to stay
12 away from it.
13    MR. RIORDAN: No, Harry did, too, and I
14 will just tell you the depositions he referred
15 to were cases filed by municipalities on
16 subdivision bonds where he gave two depositions
17 as a fact witness.
18    THE WITNESS: It was two?
19    MR. RIORDAN: Two, yeah, and they're
20 both the same owner.
21    THE WITNESS: Right. So then it would
22 be three total.
23    MR. HALLOIN: One of the nice things
24 about Con is that a lot of lawyers will just
25 fight for ground on everything. I don't want to

Page 20

1  get into your privileged communications so I
2  usually just ask Con, and he'll tell me.
3       So that's fine.  He's your client
4  contact.  I'll stay away from that sort of
5  issue.
6       MR. RIORDAN:  Yeah.
7  BY MR. HALLOIN:
8       Q.  Did you, though, meet with Con or Harry
9  prior to today to prepare for your deposition?
10      A.  Yes.
11      Q.  When did you meet?
12      A.  Yesterday.
13      Q.  And for how long did you meet?
14      A.  About two hours, two and a half hours.
15      Q.  And what did you discuss?
16      A.  General, that there will be a
17  deposition today.
18      Q.  Did you discuss the facts of the case?
19      MR. RIORDAN:  I'm going to object now
20  because I think we're getting into privileged
21  areas.
22      MR. HALLOIN:  Are you representing him
23  as a witness?  If you are, I'll back off.
24      MR. RIORDAN:  Yeah, I mean, I'm
25  representing him because he is my contact at the

Page 21

1  company so yes, --
2       MR. HALLOIN:  Okay.
3       MR. RIORDAN:  -- for the underwriting
4  issues that are in this case.
5  BY MR. HALLOIN:
6       Q.  Did you discuss Mr. Homer's deposition?
7       A.  I know he provided one.  I don't have
8  it.
9       Q.  Did you read it?
10      A.  No, I didn't review it.
11      Q.  Was the deposition discussed with
12  either Con or Harry?
13      A.  Discussed in what manner?
14      Q.  Just a "yes" or "no" for now.
15      A.  Yes, in that it was provided.
16      Q.  I'm trying to dance away from the
17  privilege just to -- content about the facts.
18      What did you discuss about Mr. Homer's
19  deposition with Mr. Riordan or -- was it with
20  Mr. Riordan or Mr. McKee?
21      A.  Mr. Riordan.
22      Q.  Okay.
23      A.  That it was provided.
24      Q.  Anything about the content of it?
25      A.  Not much about the content.

Page 22

1       Q.  What did you discuss about the content?
2       MR. RIORDAN:  Now that gets into
3  privileged areas.  I object on the basis of
4  privilege.
5       MR. HALLOIN:  I don't think it does
6  because I'm just trying to know what a fact
7  witness knows about facts provided by others
8  prior to his testifying.
9       MR. RIORDAN:  Facts obtained through
10 discussions with counsel is privileged, as is
11 even the review of documents in counsel's
12 presence, and there's cases on that.
13      MR. HALLOIN:  I don't think so, but are
14 you instructing him not to answer?
15      MR. RIORDAN:  I will instruct him to
16 tell you the general subject matter that was
17 discussed and nothing else.
18      So if you can answer the question by
19 just saying the general subject matter, it's
20 fine, but other than that, you should not answer
21 on the basis of privilege.
22      THE WITNESS:  So what's the question
23 then?
24 BY MR. HALLOIN:
25      Q.  Generally what you talked about.

Page 23

1       What I'm trying to figure out is when
2  you're a fact witness, the rules work a little
3  bit differently because sometimes a lawyer can
4  say, "Charlie testified to this," and that might
5  influence your testimony or your recollection,
6  particularly for events that are eight to
7  nine years old.  I'm just trying to figure out
8  generally what you talked about.
9       A.  That Tom was deposed and it involved
10 the indemnity agreement and more specifically to
11 the net worth agreement.
12      Q.  Okay.
13      A.  That's really all.
14      Q.  That's it?
15      Did he talk with you about
16 Mr. Michael's deposition.  You know who
17 Mr. Michael is?
18      A.  I do.
19      Q.  Did he talk with you about
20 Mr. Michael's deposition?
21      A.  Not more than it occurred, Larry did
22 make a deposition as well, and he, too, was
23 focused on the indemnity agreement.
24      Q.  Okay.  I'm by no way insinuating that
25 your counsel did anything wrong.  That's what

Case 2:13-cv-01291-LA   Filed 01/12/18   Page 10 of 42   Document 155-2

Page 24

1  lawyers do. I'm just trying to figure out that
2  we can sort out what you recall happening versus
3  what you have heard or have been refreshed from
4  another source because your obligation here
5  today is to testify to what you recall.
6       Normally, I wouldn't be putting so much
7  emphasis on that at a deposition, but these
8  events are 2008 and 2009, and it's obviously
9  2017.
10      So I'd like to talk with you generally
11 about where you are in 2008, 2009. Now, we know
12 you're working in Chicago.
13   A.  Correct.
14   Q.  Were you living in Chicago?
15   A.  Yes.
16   Q.  Where were you living, the same
17 residence as now?
18   A.  Yes.
19   Q.  Do you have kids?
20   A.  I do.
21   Q.  How old were they at the time?
22      MR. RIORDAN: I'm going to object to
23 the relevance of this, but go ahead and answer.
24      MR. HALLOIN: The pause was all I
25 needed. It's a while ago.

Page 25

1       THE WITNESS: No, I'm just doing the
2  math. Yeah, so they were -- 2008?
3  BY MR. HALLOIN:
4    Q.  Uh-huh.
5    A.  My daughter would have been 14 years
6  old, probably just in middle school, maybe first
7  year, freshman.
8    Q.  I don't want to know what the issues
9  may have been if they did exist, but did you
10 have any personal issues going on at the time?
11   A.  No.
12   Q.  Either health issues for you, a family
13 member, a parent?
14   A.  No.
15   Q.  Job issues, divorce issues?
16   A.  No.
17   Q.  Nothing like that?
18   A.  No.
19   Q.  How is your memory of 2008, 2009?
20   A.  As good as anybody else's memory would
21 be at that time period.
22   Q.  Did you look at any documents to
23 refresh your recollection prior to today?
24   A.  No, nothing more than what my counsel
25 shared with me.

Page 26

1    Q.  Okay. And what documents were those?
2       MR. RIORDAN: I'm going to object and
3  instruct him not to answer. That's privileged.
4  BY MR. HALLOIN:
5    Q.  Did you consider any documents as part
6  of your efforts to refresh your recollection?
7       MR. RIORDAN: You mean outside of my
8  presence?
9       MR. HALLOIN: Doesn't matter where.
10 BY MR. HALLOIN:
11   Q.  Did you consider any?
12   A.  No.
13      What does "consider" mean?
14   Q.  Did you read, review, digest it for the
15 purposes of trying to remember events?
16   A.  No.
17   Q.  Okay. Well, let's start then with
18 Edward E Gillen Company and your first contact.
19      I'm going to ask you some broader
20 questions first just like I did the first aspect
21 of your deposition. I think since you're
22 experienced with this, you get what I'm trying
23 to do which is knock off categories and then
24 focus on what's important.
25      Do you recall having any conversations

Page 27

1  with Gary Jackson?
2    A.  So I believe Gary attended the first
3  meeting -- I'm thinking of Richard so no, I
4  don't recall any specific conversations with
5  Gary Jackson.
6    Q.  Gary Jackson or Richard Jackson, do you
7  know?
8       MR. RIORDAN: I think he's referring to
9  Richard.
10      THE WITNESS: Richard is the president
11 or was the president at the time.
12 BY MR. HALLOIN:
13   Q.  There's references in the documents to
14 a Richard Jackson which I will just represent to
15 you as far as I know doesn't exist.
16   A.  I don't know who Richard Jackson is.
17      MR. RIORDAN: Part of the Jackson
18 family in this case. There might be a Richard
19 Jackson somewhere.
20 BY MR. HALLOIN:
21   Q.  So let's focus on Gary Jackson. Do you
22 know generally who Gary Jackson is?
23   A.  I know who he is.
24   Q.  Do you recall any specific
25 conversations with Gary Jackson?

## Page 28

1  A.  No, I don't.
2  Q.  Do you recall any specific
3 conversations with Jullane Jackson?
4       Now I'm going to pause.  There's two.
5 It's unusual.  Jullane Jackson is Gary Jackson's
6 wife.  She's in her mid 70s.  They also named
7 their eldest daughter Jullane Jackson so there's
8 two Jullane Jacksons.  I'm going to take them
9 one by one.
10      Gary Jackson's wife, do you recall any
11 conversations with her?
12  A.  No, I do not.
13  Q.  The daughter, Jullane Jackson?
14  A.  I do, and that was in attendance of a
15 meeting.
16  Q.  When was that meeting?
17  A.  It would have been in 2011.
18  Q.  Who was present for that meeting?
19  A.  I don't recall the parties.
20  Q.  What was the purpose of the meeting?
21  A.  Underwriting.
22  Q.  Underwriting for what?
23  A.  The 31st Street bridge.
24  Q.  Again, you're a nice man, and I can
25 tell you're trying to do your best.  That date

## Page 29

1 doesn't mean a whole lot.  Is it possible it was
2 a different date, a different year?
3  A.  It could be, but I know I met with
4 them.  I met with them -- I think it was in the
5 summer and then again in the fall of 2011.
6  Q.  Okay.  Now, there is a 31st Street
7 bridge project.  There's also a 31st Street
8 break water project?
9  A.  Breakwater.
10  Q.  Was it about the breakwater project?
11  A.  I believe I had a meeting with them
12 about that project.
13  Q.  Okay.  And you're confident that it was
14 about underwriting?
15  A.  Yes.
16  Q.  Is it possible it may have been
17 earlier?
18  A.  For the --
19  Q.  Again, it's a long time ago.
20  A.  It could be, yeah.
21  Q.  How would we figure out the -- the
22 reason, 2011, the project's almost done so it
23 doesn't make sense if it's the breakwater
24 project, not the bridge.
25  A.  I see where you're going with that.

## Page 30

1      So the breakwater project would have
2 been 2010 for the actual project, and then '11
3 would have been as things progressed so I think
4 I attended a meeting in '10, but I might not
5 have.  I did attend meetings in '11.
6  Q.  Okay.  Let's focus on the meeting that
7 Jullane Jackson was present for and maybe we can
8 figure out through the process of you telling me
9 what you do recall about the meeting who was
10 present.
11  A.  Well, let's see.  In 2011, Larry
12 Michael, Rick Breckke and myself, Richard.
13 There was a CFO there.  I don't recall his name.
14  Q.  Richard who?
15  A.  Begins with a Z.
16  Q.  Zirbel?
17  A.  Zirbel.
18  Q.  Anybody else?
19  A.  The CFO.  I don't recall his name.
20  Q.  Of?
21  A.  Edward Gillen.
22  Q.  Steven Vanderbloemen?
23  A.  So Vanderbloemen was there as a CPA
24 representative in a second meeting, a different
25 meeting.

## Page 31

1  Q.  I'm just focusing on the one with
2 Jullane Jackson.
3  A.  Okay.  She might have been in both, but
4 I think she was at least in the first one.
5  Q.  Okay.  And the CFO?
6  A.  I don't recall his name.
7  Q.  Do you have any documents relating to
8 this meeting?
9  A.  Whatever is in the underwriting file.
10  Q.  And that would be none.
11      Do you believe that you took notes,
12 or what would have been your practice to record
13 what happened?
14  A.  Rick would have recorded notes.
15  Q.  So you would not have, I take it?
16  A.  Most likely, no.
17  Q.  Do you keep track of your appointments
18 on a calendar?
19  A.  I do.
20  Q.  How far does your calendar go back?
21  A.  I'd have to check.
22  Q.  Is it electronic?
23  A.  Yes.
24  Q.  Good.
25      Did you have an electronic calendar

Page 32

1  back in 2011, 2010?
2     A.  Yes, I believe so.
3     Q.  So we might be able to figure out the
4  dates of these three potential meetings from
5  that calendar?
6     A.  Potentially, yes.
7     Q.  What's the software used for it?  Is it
8  Outlook?
9     A.  So back then, it would have been Lotus
10  Notes.
11     Q.  Good.
12       So you could do a word search?  It's
13  not hard, right?  You could search for "Gillen"
14  and figure out the dates?
15     A.  I assume so.
16     Q.  I don't know if I care yet or not so
17  let's focus on the three meetings.  We'll take
18  them one by one.
19     A.  It might have been two, but I know two
20  for sure.  There might have been a third one.
21     Q.  You know, the dates are important; the
22  precise number of meetings rarely is because
23  most people tend to put them together around
24  dates so I'm going to start with 2010.
25       For the 2010 meeting, do you recall who

Page 33

1  was present for that if there was one?
2     A.  So I think in 2010, that would have
3  been for the 31st breakwater, and that meeting
4  would have been Larry, Michael, Rick Breckke,
5  myself, Richard who was the president.
6     Q.  Richard Zirbel?
7     A.  Yeah.
8       And there was others, and I don't
9  recall.  I think they were of a superintendent
10  or project manager nature who could talk about
11  the project.
12     Q.  Now, was this before the start of the
13  project?
14     A.  Yes.
15     Q.  And do you have a specific recollection
16  of Jullane Jackson being present?
17     A.  I believe she was, but I don't
18  specifically recall.
19     Q.  I'm going to take you on a tangent and
20  then come back.
21       Have you ever had any conversations --
22     A.  Jullane Jackson, the daughter?
23     Q.  Yeah, the daughter.
24       You've indicated that you've had
25  contact now with Jullane Jackson, with Steve

Page 34

1  Vanderbloemen who at some point in time became
2  statutory CFO for the company and Richard
3  Zirbel.
4     A.  Right.
5     Q.  You've indicated you don't have a
6  recollection of any conversations with Gary
7  Jackson, correct?
8     A.  You know, he might have been there.  I
9  just don't recall.
10     Q.  If you don't recall, that's all I'm
11  seeking at this point.
12       And you also don't recall any
13  conversations with Andrea Jackson, another one
14  of his daughters?
15     A.  I do not recall that.
16     Q.  How about Kristen Jackson,
17  K-R-I-S-T-E-N?
18     A.  I do not recall.
19     Q.  So the potentials that you may have had
20  contact with would be Jullane Jackson, the
21  daughter; Richard Zirbel, the president; a CFO
22  and Steve Vanderbloemen?
23     A.  Yes.
24     Q.  And do you know whether or not Steve
25  Vanderbloemen was there as an accountant or as a

Page 35

1  statutory CFO?
2       Do you know what that is?
3     A.  No.  Describe that, please.
4     Q.  Wisconsin has a procedure that's
5  different from Illinois where you can hire an
6  outside accountant or accounting firm to be your
7  CFO.  The difference is they have to have
8  different types of insurance and the like, like
9  a CFO, errors and omissions.
10       Mr. Vanderbloemen for a period of some
11  point -- and I'm not going to tell you when
12  because I don't want to influence your
13  testimony -- was the acting CFO for Gillen.  He
14  would have introduced himself differently to
15  you.  That's why if you knew if he was with a
16  CPA firm or not, it would be helpful.
17     A.  So I do not recall.  My recollection
18  would be he was an outside CPA firm in the last
19  time I met him.
20     Q.  Okay.  The CFO that you're referring
21  to, was it a CFO of Edward E. Gillen?
22     A.  Or else he was an accountant of some
23  sort from Gillen, yes.  Managed the books.  I
24  don't know whether that's a CFO or an accountant
25  or whatever.

**Page 36**

1    Q. It helps me identify the date of this
2 meeting.
3     Okay. Now I'm going to go back to
4 content. Let's go to the 2010 meeting. Was
5 anyone there from Paschen, Gillen, Skipper
6 Marine Joint Venture or the Paschen Company?
7    A. No.
8    Q. Do you recall anything that Jullane
9 Jackson specifically said at that meeting?
10    A. I do not recall.
11    Q. Do you recall anything that Larry
12 Zirbel specifically said at that meeting?
13    A. I do not recall.
14    Q. Do you recall anything that the
15 superintendent that you spoke to said at that
16 meeting?
17    A. Are we talking in general, like, what
18 the topics of the meeting were, or are you
19 talking about a specific conversation?
20    Q. I'm just trying to rule out your
21 showing up at trial and saying, "I remember the
22 meeting like it was clear as day and so-and-so
23 said this," which I think is unlikely given it's
24 eight years ago.
25    A. Yeah, I don't recall the specific

**Page 37**

1 thread of conversation.
2    Q. The superintendent, was it Gillen's
3 superintendent?
4    A. I don't recall.
5    Q. I'm going to give you a couple of names
6 because there's only two. Tom Gaulke. Hard
7 name to forget because he weighed at that time
8 about 400 pounds.
9     Sound familiar?
10    A. Sounds familiar, but I don't know him.
11    Q. Most people don't forget him because
12 he's also really funny.
13     Is it possible that that's who was
14 there?
15    A. Possibly.
16    Q. The only other superintendent was about
17 26 at the time, Ben Koepsell?
18    A. That I don't recall.
19    Q. So do you know amongst the two who it
20 would be?
21    A. It would be more Tom than Ben.
22    Q. Do you recall anything that Tom said at
23 that meeting?
24    A. No, I don't recall.
25    Q. Now, you said you might remember

**Page 38**

1 subjects. Can you tell me what subjects were
2 discussed?
3    A. I believe the first one was discussing
4 the project of the 31st Street breakwater.
5    Q. Do you recall how it was described?
6    A. In what way?
7    Q. You said you generally recall.
8    A. A description of the project and what
9 they wanted to build, what the project consisted
10 of and how they would approach the project.
11    Q. Do you recall anything specific about
12 what they said?
13    A. No, I don't recall.
14    Q. Now, you mentioned something about a
15 31st Street bridge.
16    A. Mistake on my part.
17    Q. It's actually -- there is a bridge.
18 Have you ever been there?
19    A. No.
20    Q. There is reference to it and the like.
21 I'm just trying to see, is it anything that you
22 were involved in?
23    A. No.
24    Q. I know nothing about it other than it
25 just keeps coming up.

**Page 39**

1    A. That was a mistake on my part.
2    Q. Wrong project?
3    A. Wrong project.
4    Q. This was about the breakwater?
5    A. The breakwater.
6    Q. And Jullane Jackson wasn't there,
7 correct?
8    A. I don't recall if she was there.
9    Q. Do you believe that Mr. Zirbel said
10 anything to you that was untrue at the time of
11 that meeting in 2010?
12    A. Not that I'm aware of.
13    Q. The superintendent, do you believe that
14 they said anything that was untrue?
15    A. Not that I'm aware of.
16    Q. Okay. And do you believe anyone from
17 Gillen who was present said anything untrue at
18 that meeting?
19    A. Not that I'm aware of.
20    Q. Now, let's go to 2011, the one or two
21 meetings that you may have had. You've
22 identified who was present at those.
23     Same thing. I'm just looking for
24 specific recollections of things that were said,
25 and then we'll go to general.

Case 2:13-cv-01291-LA   Filed 01/12/18   Page 14 of 42   Document 155-2

**Page 40**

1      Do you recall anything that was
2  specifically said by Jullane Jackson at either
3  meeting?
4     A.  I do not recall.
5     Q.  Before I go any further, you said one
6  or two.  Is it fair to say that your memory is
7  merged with respect to those meetings, that if
8  you recall, it was probably -- as I said, it
9  doesn't matter if there's two meetings or one.
10      Is your memory pretty much of just the
11  events of those meetings?
12    A.  Yes.
13    Q.  Okay.  Is there any distinguishing
14  event from the two meetings that you recall?
15    A.  No.
16    Q.  So let's go back.  Jullane Jackson, do
17  you recall anything that she specifically said?
18    A.  No.
19    Q.  Rick Zirbel, do you recall anything
20  that he specifically said?
21    A.  No.
22    Q.  Steven Vanderbloemen, do you recall
23  anything that he specifically said?
24    A.  No.
25    Q.  And the CFO, the unidentified CFO, do

**Page 41**

1  you recall anything that he or she specifically
2  said?
3     A.  No, I don't.
4     Q.  Now, we've got a couple of options.
5  Was it a he or a she?
6     A.  He.
7     Q.  Let's go generally.  What do you
8  generally recall about the meetings?
9     A.  So the last meeting was of a nature
10  where we were called to talk about the financial
11  situation, and Steve in my opinion who was
12  representing as an outside CPA led the meeting
13  to discuss where the company stood financially.
14    Q.  Do you recall what he said?
15    A.  Not in specifics.
16    Q.  In general?
17    A.  That the company was losing a lot of
18  money.
19    Q.  How much?
20    A.  Millions.
21    Q.  Okay.  Anything else?
22    A.  That there was a definite impact on the
23  balance sheet.
24    Q.  Did he explain why it was losing money?
25    A.  Job project losses.

**Page 42**

1    Q.  For the 31st Street project?
2    A.  On the 31st Street project.
3    Q.  Did he describe what those losses were?
4    A.  I don't recall.
5    Q.  Did he say anything else?
6    A.  I don't recall.
7    Q.  Do you believe that he said anything
8  that was untrue to you?
9    A.  Not that I'm aware of.
10    Q.  Do you believe Jullane Jackson said
11  anything that was untrue?
12    A.  Not that I'm aware of.
13    Q.  Richard Zirbel?
14    A.  Not that I'm aware of.
15    Q.  Or this unnamed outside CFO?
16    A.  Not that I'm aware of.
17    Q.  Who requested the meeting?  Was it
18  requested by Zurich?
19    A.  No.
20    Q.  Or was it requested by F&D?
21    A.  No.
22    Q.  What's the relationship between Zurich
23  and F&D?
24    A.  Zurich owns Fidelity and Deposit
25  Company.

**Page 43**

1    Q.  Do you hold any position with respect
2  to Zurich?
3    A.  Yes.
4    Q.  What position do you have?
5    A.  I am a senior vice president of Zurich.
6    Q.  Okay.  That's in addition to the title
7  that you have with F&D?
8    A.  Well, it's a Zurich title.  Zurich
9  utilizes Fidelity and Deposit Company for the
10  bond paper.
11    Q.  So who requested the meeting?  Was it
12  something that was requested by Gillen, Zurich,
13  F&D?
14    A.  Gillen.
15    Q.  Why did Gillen request the meeting?
16    A.  To inform us of the financial impact of
17  the 31st breakwater.
18    Q.  Was that something that they were
19  required to do?
20    A.  No.
21    Q.  Was it something that they voluntarily
22  did?
23    A.  Yes.
24    Q.  Is that the type of behavior that you
25  encourage from people that you've underwritten

Case 2:15-cv-01291-LA   Filed 01/12/18   Page 15 of 42   Document 155-2

Page 44

1  bonds for?
2      A.  Yes.  They should tell us of serious
3  financial matters, yes.
4      Q.  So although the content that's
5  delivered might not have been received as a good
6  thing, the process of alerting you is something
7  that you would have encouraged?
8      A.  Yes.
9      Q.  Any other contact with Jullane Jackson?
10      A.  I don't recall.
11      Q.  Any other contact with Richard Zirbel?
12      A.  No.
13      Q.  Any other contact with this unnamed
14  CFO?
15      A.  No.
16      Q.  Any other contact with Steve
17  Vanderbloemen?
18      A.  No.
19      Q.  Now, the one thing noticeably absent
20  from the meeting list you have is anything that
21  predates during the original -- strike that.
22          Anything that is during the original
23  underwriting process that Gillen went through,
24  when you went through that original underwriting
25  process, when F&D did so prior to the 31st

Page 45

1  Street project, did you have any contact with
2  Gary Jackson?
3      A.  I don't recall.
4      Q.  Jullane Jackson, the daughter?
5      A.  Prior to when?
6      Q.  Focusing on the original underwriting
7  process, not 31st Street.
8      A.  Okay.  Original underwriting.
9      Q.  We've covered now -- let me make clear.
10          During the 31st Street project, do you
11  believe that you may have had up to three
12  meetings?
13      A.  Yes.
14      Q.  And that would be the sum total of the
15  contacts that you had with Gary Jackson; Jullane
16  Jackson; Jullane Jackson, the daughter; Andrea
17  Jackson; Kristen Jackson; Richard Zirbel, the
18  president; Steve Vanderbloemen or this unnamed
19  CFO?
20      A.  Correct.
21      MR. RIORDAN:  I'd just like to say I
22  think you're mischaracterizing the testimony
23  because the first meeting as I understood it
24  occurred prior to the commencement of the job
25  because it had to do with the underwriting of

Page 46

1  the bond for the job.
2      MR. HALLOIN:  For 31st Street.
3      MR. RIORDAN:  Yeah, but you said
4  "during the project."
5  BY MR. HALLOIN:
6      Q.  I understand maybe it's just because
7  I'm making an assumption that's incorrect.
8          It appears from the file that there's
9  two periods where F&D's underwriting is touching
10  this.  One is specific to the 31st Street.  That
11  project's in 2011, late 2010.  It starts
12  April-ish, 2010, but there's an earlier period
13  in 2008, 2009 where you're looking at
14  underwriting them as a client generally; is that
15  correct?
16      A.  Yes.
17      Q.  I'm focusing on that first period now,
18  just the underwriting process as a client
19  generally.  Just again, I'm trying to figure out
20  if you have any recollection of any specific
21  conversations.  I don't think you do from the
22  deposition so far, but I'm going to go through
23  the same names.
24      A.  And this is from the original
25  underwriting when Tom Homer --

Page 47

1      Q.  Tom Homer is working with Tom Homer and
2  at the end with Richard Breckke.
3      A.  Tom Homer was working with Larry
4  Michael.
5      Q.  Sorry.
6          It's the period where Tom Homer is
7  working with Larry Michael and then Tom Homer
8  leaves and Richard Breckke takes over, but it
9  predates 31st Street.  Okay?
10      A.  Got it.
11      Q.  And if you don't remember Richard
12  Breckke being involved, I'm not trying to tie
13  you to that; I'm just trying to frame the period
14  of this as the investigation that's done of
15  Edward E. Gillen Company before the 31st Street
16  project discussions start.  Okay?
17          Do you recall having any conversations
18  with Gary Jackson?
19      A.  No.
20      Q.  With Jullane Jackson, his wife?
21      A.  No.
22      Q.  Jullane Jackson, his daughter?
23      A.  No.
24      Q.  Andrea Jackson, his second daughter?
25      A.  No.

Page 48

1   Q.   Kristen Jackson, his third daughter?
2   A.   No.
3   Q.   Richard Zirbel, the president of the
4 company?
5   A.   No.
6   Q.   The unnamed CFO?
7      Now, I'm not trying to hide the names.
8 I just don't remember what they are. There's a
9 man and there's a woman or vice versa.
10      Any CFO?
11   A.   No.
12   Q.   With Tom Gaulke?
13   A.   No.
14   Q.   With Tom Miller, the vice president of
15 the company?
16   A.   No.
17   Q.   With Ben Koepsell, the ultimate
18 superintendent for portions of the 31st Street
19 project?
20   A.   No.
21   Q.   Okay. So no conversations?
22   A.   But Tom Miller's name, now, that I
23 recall was in a meeting later so Tom was at one
24 of the meetings.
25   Q.   Now, that would make sense.

Page 49

1      Is it possible the person you thought
2 was the CFO was actually Tom Miller?
3   A.   I'm not sure, but that name rings a
4 bell.
5   Q.   What meeting would he have been at?
6   A.   Possibly the first underwriting meeting
7 of the 31st breakwater.
8   Q.   Okay. Good.
9      But as to Tom, you don't recall any
10 conversations?
11   A.   Not previous to that meeting.
12   Q.   So is it a fair statement that any
13 conversations that you would have had about
14 underwriting Gillen in general would have been
15 through Mr. Homer or through Mr. Michael?
16   A.   Yes.
17   Q.   You have no firsthand recollection of
18 any contacts of any kind?
19   A.   With the Gillen team?
20   Q.   Yes.
21   A.   No.
22   Q.   And that would include via e-mail,
23 letter, telephone, voicemail, cell phone, any
24 type of contact.
25   A.   At the underwriting stage?

Page 50

1   Q.   Yes.
2   A.   No.
3   Q.   Okay. That helps me.
4      What I'm going to suggest is if we
5 could take now a couple-minute break, stretch
6 your legs, and I'll just get the appropriate
7 exhibits out to ask you questions about. It
8 will be faster if I do that.
9      MR. HALLOIN: Is that okay?
10      MR. RIORDAN: Sure.
11      MR. HALLOIN: Thank you.
12      (Whereupon, a short recess was
13        taken.)
14      (Whereupon, Hannigan Deposition
15        Exhibit 1 was marked for
16        identification.)
17 BY MR. HALLOIN:
18   Q.   Sir, I'm handing you Exhibit No. 1.
19 Have you seen this before?
20   A.   I believe so.
21   Q.   I'm going to give you a chance to read
22 it, given the time that's passed.
23      This is the document that I mistakenly
24 thought Richard was Eric. Why don't you take a
25 look at it, read it, tell me when you're ready.

Page 51

1      Okay?
2   A.   Yeah.
3   Q.   What is this document?
4   A.   This would be part of an underwriting
5 review of the account.
6   Q.   Done by Mr. Breckke?
7   A.   Done by Mr. Breckke.
8   Q.   Is this something that is normally done
9 by an underwriter?
10   A.   Yes.
11   Q.   Just from looking at the dates, this is
12 the earliest file touch that we've been able to
13 locate of Mr. Breckke from the documents
14 produced. Is it possible that this is when
15 Mr. Homer left and Mr. Breckke took over the
16 account?
17   A.   Yes.
18   Q.   Would that make sense to you, that he's
19 trying to capture as much information as
20 possible?
21   A.   Yes.
22   Q.   What would have been the source of the
23 information? When you're doing this type of
24 memo, where would you go to get the underlying
25 information? Would it be to Mr. Michael,

**Page 52**

1 Mr. Homer?  What types of things would you go
2 to?
3    A.  Well, it would have been his knowledge
4 of the account.  A lot of this is what he knows
5 about the account.
6    Q.  So just his stream of consciousness of
7 the account, or would there be any source
8 identification?
9    A.  There would be underwriting information
10 from Larry Michael and from the account that
11 would have provided financial information,
12 banking information, equipment information.
13 There would have been information provided by
14 the contractor.
15    Q.  So it would have been based upon the
16 information that F&D had already, paper
17 information?
18    A.  Yes.
19    Q.  Would they have had access to
20 Mr. Michael's files at the Brehmer agency?
21    A.  No.
22    Q.  There's a lot of mistakes in this
23 document so what I'm trying to figure out is how
24 those mistakes came to be.  We're going to go
25 through them one by one.  That's why I'm curious

**Page 53**

1 about what the source would be of it.
2       Would it be customary for someone like
3 Mr. Breckke to contact Mr. Michael?
4    A.  Yes.
5    Q.  Okay.  Would Mr. Michael be provided a
6 copy of this document?
7    A.  No.
8    Q.  So it would have been distributed
9 solely internally?
10    A.  Yes.
11    Q.  Okay.  The documents are helpful for
12 other things, too, because it gives names so
13 let's start there.  Let's go to Page 3.
14       You mentioned the unnamed CFO, and
15 there was a controller named Ronald Carter.  Is
16 that the person who you met with?
17    A.  I believe so.
18    Q.  Okay.  You indicated a project manager
19 or supervisor, and all of them are listed
20 conveniently on this document under "Field
21 Construction Supervision."
22       Does that list refresh your
23 recollection as to who might have been the
24 supervisor that you met with?
25    A.  I believe it was Tom Miller.  It could

**Page 54**

1 have been Tom Gaulke.
2    Q.  Again, Mr. Gaulke would have been
3 notable by his size.
4    A.  I don't recall.  The name is familiar.
5    Q.  They're the two senior-most people.
6    A.  Maybe they were both there.  I'm not
7 exactly sure, but the names are both familiar.
8    Q.  Can you just look through the names
9 that are on Page 3 to see if any of the other
10 names sound like someone you may have met?
11    A.  So Ron Carter, that sounds familiar,
12 Tom Miller, Tom Gaulke, Richard.
13    Q.  Zirbel?
14    A.  Yeah, Richard Zirbel.
15       I'm not sure whether Gary Jackson was
16 present.
17    Q.  I'd be surprised.
18    A.  I don't recall him.
19       Richard, I believe, ran the meetings
20 that I was involved in.
21    Q.  I don't think it's disputed in this,
22 Gary Jackson started his retirement process
23 right at the start of the project so I'd be
24 surprised if he was there, but I'm asking just
25 to be thorough.

**Page 55**

1    A.  I might have met him the first time at
2 the first meeting.  I might have.  I'm not
3 specifically recalling him, but I might have met
4 him.
5    Q.  Do you recall anything specific that
6 Mr. Miller or Mr. Gaulke or Mr. Zirbel said?
7    A.  No.
8    Q.  Can we go back to the first page?
9       Now, is it a fair statement that you
10 don't have any firsthand knowledge about the
11 Gillen account; it would be simply knowledge you
12 obtained from documents like Exhibit No. 1
13 compiled by others?
14    A.  Yes.
15    Q.  You didn't do any firsthand research;
16 is that a fair statement?
17    A.  No.  Yes, I did not do any firsthand
18 research.
19    Q.  I'm just going to ask you then if these
20 statements are consistent with your
21 understanding:  That the Edward E. Gillen
22 Company came from Larry Michael at the Brehmer
23 agency.  Is that consistent with your
24 understanding?
25    A.  Yes.

Page 56

1   Q. That Mr. Michael took it from a Chicago
2 agent and St. Paul Surety in the fall of 2004
3 when St. Paul asked for a substantial rate
4 increase and a personal indemnity; is that
5 consistent with your understanding?
6   A. I do not know about that.
7   Q. No firsthand knowledge of it?
8   A. None.
9   Q. Larry was able to place it with Liberty
10 Mutual; do you know anything about that?
11   A. No.
12   Q. Mr. Breckke makes a statement: "We
13 have been involved with the account as backup
14 since 2005." Do you know what he means by that?
15   A. Meaning we would have had it on our
16 prospect list and asking the agent for an
17 opportunity, and the agent may have been giving
18 us some insight to them to keep us informed as
19 backup.
20   Q. Then maybe I just misunderstood the
21 word "backup" for this.
22   I'm not aware of any bond actually
23 having been issued until the 31st Street
24 project.
25   A. No. Backup would be more of a

Page 57

1 prospect. The company would have been a
2 prospect. Tom would have been interested in
3 pursuing them as a customer.
4   Q. Okay.
5   "The firing of most of the Liberty
6 underwriting staff in Wisconsin by the new
7 Safeco management in early 2009 put established
8 underwriting relationships in question so Larry
9 asked us to get up to speed on the account," is
10 that a true statement?
11   A. I don't know about that.
12   Q. Did you have any conversations with
13 Larry Michael about this account?
14   A. I don't recall.
15   Q. He's kind of an institution in our
16 state. He's probably wrote more bonds than
17 everybody else put together, but have you ever
18 met him face to face?
19   A. Oh, yes, yes.
20   Q. Have you ever had any conversations
21 with him about Edward E. Gillen Company?
22   A. Yes.
23   Q. Okay. When?
24   A. He would have been at the meetings so
25 he was at the meetings.

Page 58

1   Q. How about since 2012?
2   A. I've seen Larry at other business
3 events.
4   Q. Okay. Have you talked with him about
5 Edward E. Gillen Company since 2012?
6   A. No.
7   Q. Okay. Can we go to basic account
8 information?
9   A. Uh-huh.
10   Q. There's a reference to an Andrew
11 Jackson. Do you know anything about that?
12   A. No.
13   Q. Do you know where he might have
14 received this information?
15   A. No.
16   Q. Can we go to the next page?
17   Work experience, I'll let you read that
18 paragraph on the top of Page 2.
19   Do you know where that information came
20 from?
21   A. Not specifically.
22   Q. Do you know generally where it came
23 from?
24   A. Probably from review of the
25 work-in-progress schedules.

Page 59

1   Q. Now, we do have some documents that
2 have been produced in that regard.
3   A. Or it could have been provided by
4 Gillen as a list of their largest projects.
5   Q. I don't know. All I know is what was
6 produced to us so I collected information that
7 was all together under a flag "Underwriting" in
8 the production.
9   (Whereupon, Hannigan Deposition
10   Exhibit 2 was marked for
11   identification.)
12 BY MR. HALLOIN:
13   Q. Now, before you look at this, sir, I'll
14 reflect to you this is a staple that represents
15 a file. I have no idea how it was maintained
16 within the file, but it appears that there's
17 multiple documents that are in the file,
18 multiple financial information.
19   I'd like you to take a look at this to
20 see if this is information that you've seen
21 before.
22   A. So what is your question?
23   Q. Have you seen any of it before?
24   A. I believe so.
25   Q. What is that information?

**Page 60**

1  A.  It appears to be an account receivable
2  aging schedule.
3  Q.  Okay.  Actually, multiple ones,
4  correct?
5  A.  Correct.
6  Q.  Is that information that would have
7  been reviewed by either you or Mr. Homer or
8  Mr. Breckke as part of decisions to underwrite
9  bonds for Edward E. Gillen Company?
10  A.  Yes.
11  Q.  By which of you, all three of you?
12  A.  Possibly.
13  Q.  How would they have been used by any of
14  you?
15  A.  To look at the receivables, where
16  they're coming from and how much they are and
17  from what dollars.
18  Q.  So accounts receivable is a
19  consideration that you give in determining
20  whether or not to issue a bond?
21  A.  Yes.
22  Q.  Is there an underwriting book or a
23  series of underwriting guidelines that exist at
24  F&D?
25  MR. RIORDAN:  Today or at the time?

**Page 61**

1  BY MR. HALLOIN:
2  Q.  At the time, 2008 to 2011.
3  A.  Probably an underwriting manual of some
4  variety.
5  Q.  Would that have identified how accounts
6  receivables should be analyzed?
7  A.  I don't recall specifically.
8  Q.  What would have been your practice from
9  2008 to 2011 with respect to accounts
10  receivable?  How would you use that information?
11  A.  Review the receivables for the quality
12  of the receivables, who they're coming from and
13  how late they might be.
14  Q.  Anything else?
15  A.  The overall mix of the receivables,
16  private owners, public owners, any one large
17  receivable.
18  Q.  The amount of the receivables?
19  A.  Yeah, the amounts and the dates, 30,
20  60, 90 aging on the receivables.
21  Q.  I'll make this simple.  It strikes me
22  that given your position that you would look at
23  the total amount, the aging to determine
24  collectability, you'd try to look at problematic
25  receivables and you'd try to establish trends in

**Page 62**

1  the business with respect to those receivables.
2  Is that a fair statement?
3  A.  That's a fair statement.
4  Q.  And that would factor then into any
5  decision you made to underwrite a bond; is that
6  a fair statement?
7  A.  Yes, receivables are considered as part
8  of our underwriting.
9  Q.  Okay.  I'm going to come back to that
10  in a moment so why don't you put that exhibit
11  aside?  Because there's more of the file, but I
12  want to finish this document first.
13  Related companies, here's the first of
14  the errors that I saw.  It says, "DLH
15  Construction and Trucking, Inc. is owned by Gary
16  Jackson's three daughters."  That's not the part
17  I'm concerned about.
18  "This is a woman-owned business status
19  for bidding federal work," I'm not worried about
20  that, either.
21  "We have personal indemnity of the
22  daughters and a cross-corporate indemnity from
23  Edward E. Gillen Company to support this
24  operation."  Do you see that?
25  A.  I see it.

**Page 63**

1  Q.  I'm not aware of any personal indemnity
2  agreement from the daughters.  Do you know
3  whether or not there is such a document?
4  A.  I do not.
5  Q.  I'm aware of no cross-corporate
6  indemnity from Edward E. Gillen Company to
7  support the operation.  Are you aware of any
8  such document?
9  A.  No.
10  Q.  One of the things I learned in the
11  document requests that we've made is that those
12  documents did originally exist, but they existed
13  to Safeco.  They were produced as part of the
14  document production that was made.
15  Is it your contention that F&D has the
16  ability to enforce any type of cross-corporate
17  indemnity or personal guarantees that were
18  issued to Safeco?
19  A.  That's not my understanding.
20  Q.  To your knowledge, did the company
21  undertake any sort of assignment of any type of
22  indemnity or guarantees associated with the
23  Safeco relationship with the company?
24  A.  I'm not aware of that.
25  MR. RIORDAN:  You're referring to DLH,

Case 2:13-cv-01291-LA   Filed 01/12/18   Page 20 of 42   Document 155-2

Page 64

1 correct?
2        MR. HALLOIN:  DLH, cross-corporate
3 indemnity from Gillen involving Gillen and DLH.
4        MR. RIORDAN:  Because this appears to
5 be talking about the underwriting of DLH and not
6 Gillen.
7        MR. HALLOIN:  Let me make this simple.
8 BY MR. HALLOIN:
9    Q.  I'll show you the documents.
10   A.  Please do.
11   Q.  Here's Exhibit No. 3.
12        (Whereupon, Hannigan Deposition
13          Exhibit 3 was marked for
14          identification.)
15 BY MR. HALLOIN:
16   Q.  I'll give you a chance to look at this
17 and I'll give you the next one as well.
18        MR. RIORDAN:  My only point, Scott, is
19 that are you asking him if this statement refers
20 to indemnity given to Gillen as opposed to
21 indemnity for DLH?
22        MR. HALLOIN:  There's no secrets here.
23 It's just the file, having gone through it now
24 ad nauseam, there's references to a
25 cross-corporate indemnity and kid indemnities,

Page 65

1 and your files contain these indemnity
2 agreements, but they are also pretty clearly
3 from the cover pages Liberty indemnities.
4        I'm just trying to verify because I
5 think what happened is this gentleman,
6 Mr. Breckke, just made a mistake, that there is
7 no cross-corporate indemnity and that there are
8 no guarantees from the three daughters.
9        MR. RIORDAN:  Well, if you're talking
10 about Gillen -- well, if you're talking about
11 DLH, my understanding is that the daughters did
12 give indemnity to F&D for DLH because they were
13 the owners and that Gillen was a corporate
14 indemnitor for DLH.  That's why I think this --
15        MR. HALLOIN:  That's what I'm actually
16 driving at.
17        MR. RIORDAN:  This statement refers to
18 that relationship and not --
19        MR. HALLOIN:  We'll get to that.
20        MR. RIORDAN:  All right.  Because your
21 question is confusing, and I just want to make
22 sure the witness understands that you're asking
23 him essentially if we had indemnity from the
24 daughters for Gillen as opposed to DLH.
25        MR. HALLOIN:  Mark that exhibit, and

Page 66

1 I'm also going to hand you another exhibit as
2 well.
3        (Whereupon, Hannigan Deposition
4          Exhibits 4&5 were marked for
5          identification.)
6 BY MR. HALLOIN:
7    Q.  Now, I can tell you, sir, although
8 there are no Bates number codes on these
9 documents, these are documents that have been
10 produced by F&D, but when I go to print them,
11 for some reason, the numbers don't transfer.  So
12 I'm just trying to figure out what are the
13 relevant documents here.
14        We're going to go to the DLH indemnity
15 that he referred to in a moment that I'm trying
16 to rule these out.
17        Have you seen Exhibit No. 3 before?
18   A.  No.
19   Q.  Is it your contention that F&D is
20 entitled to the ability to enforce any terms of
21 this 1 one to the General Agreement of
22 Indemnity?
23   A.  Not that I'm aware of, but I don't know
24 what the agreement is.
25   Q.  Well, it's a 2004 amendment to a

Page 67

1 Safeco/Liberty -- it's part of the whole Wausau
2 insurance program.  It was in the underwriting
3 file.  I just don't know why it's there.
4        Is it your contention that this is
5 something that F&D is able to enforce?
6    A.  Not that I'm aware of.
7    Q.  There's an unsigned Amendment Number 2
8 to the General Agreement of Indemnity which is
9 Exhibit No. 4.  Same question.  Is this
10 something that F&D is contending that it is
11 entitled to enforce?
12   A.  Not that I'm aware of.
13   Q.  If you go to Exhibit No. 5, I will tell
14 you that this is proximal to the two indemnity
15 agreements, and it's a letter from Pam Selke to
16 Larry Michael at the Brehmer agency, and you'll
17 see it states: "Enclosed you will find three
18 indemnity agreements and corporate
19 resolutions for DLH Construction and Trucking,"
20 and then it gives some execution information.
21        Now, we know from the history of this
22 that that's about the time that Edward E. Gillen
23 Company started reaching out to F&D.
24        Do you have any familiarity with any of
25 these documents, the three indemnity agreements,

Page 68

1 the three corporate resolutions for DLH?
2  A. No.
3  Q. Is it your contention here that any of
4 the documents that were provided to Liberty
5 Mutual Surety are something that F&D has the
6 ability to enforce?
7  A. Not that I'm aware of.
8  Q. Do you know why it's in the
9 underwriting file?
10  A. No.
11  Q. Could it just be straight papers?
12  A. Possibly.
13  MR. HALLOIN: This will be Exhibit 6.
14   (Whereupon, Hannigan Deposition
15   Exhibit 6 was marked for
16   identification.)
17  MR. HALLOIN: Mark this as No. 7.
18   (Whereupon, Hannigan Deposition
19   Exhibit 7 was marked for
20   identification.)
21 BY MR. HALLOIN:
22  Q. Have you had a chance to review
23 Exhibit 6?
24  A. Yes.
25  Q. Have you seen Exhibit 6 before?

Page 69

1  A. No.
2  Q. Do you know what consideration was
3 given by Mr. Homer or Mr. Breckke to this
4 document?
5  A. No.
6  Q. Can you look at Exhibit No. 7?
7  MR. RIORDAN: Is there a reason there's
8 a paper clip on this, Scott?
9  MR. HALLOIN: It was just clipped to
10 this one.
11  MR. RIORDAN: I thought we might have
12 lost a page, that's all.
13 BY MR. HALLOIN:
14  Q. Have you seen Exhibit 7 before?
15  A. No.
16  Q. Do you know who consideration may have
17 been given by Mr. Homer or Mr. Breckke to this
18 document?
19  MR. RIORDAN: Objection.  The question
20 assumes that any consideration was given at all.
21 You can go ahead and answer.
22  THE WITNESS: No.
23 BY MR. HALLOIN:
24  Q. Did you have any discussions with
25 Mr. Homer with respect to what Edward E. Gillen

Page 70

1 Company's intentions were with respect to the
2 bonds that it might purchase from F&D?
3  A. Please restate your question.
4  MR. HALLOIN: Why don't you re-read it,
5 if you could.
6   (Whereupon, the record was
7   read as requested.)
8  MR. RIORDAN: Object to the form.
9  THE WITNESS: I'm not clear on the
10 question.  Can you please rephrase it?
11 BY MR. HALLOIN:
12  Q. Sure.
13  Did you have any discussions with
14 Mr. Homer with respect to what Gillen wanted
15 with respect to any bonds it might ultimately
16 obtain as a result of its relationship with F&D?
17  MR. RIORDAN: Object as to form.
18 BY MR. HALLOIN:
19  Q. What was your understanding of what
20 Gillen was looking for?
21  MR. RIORDAN: Again, I'm going to
22 object as to form.  I'm not sure what you're
23 talking about.
24  THE WITNESS: I'm not sure what you're
25 talking about.  The original underwriting?

Page 71

1 BY MR. HALLOIN:
2  Q. Yeah, in the original underwriting.
3  A. In the original underwriting, I did
4 speak with Tom Homer.
5  Q. What do you recall talking with him
6 about?
7  A. He called.  It was because that job was
8 bidding, and it seemed like Gillen was not
9 getting approval from Liberty to bid on a
10 project.
11  Q. An environmental project?
12  A. Environmental-oriented project in the
13 river, and we had an opportunity to step in if
14 we could support the bid to handle the account.
15  Q. Was it explained to you that Gillen was
16 hopeful to try to obtain terms similar to that
17 that it had with Liberty?
18  A. Yes, to a degree.
19  Q. What was your understanding in that
20 regard?
21  A. Well, what's your specific point?  In
22 terms of job size?
23  Q. What was it trying to achieve?  Yeah.
24  A. Types of projects that they were
25 looking for?

Case 2:13-cv-01291-LA   Filed 01/12/18   Page 22 of 42   Document 155-2

**Page 72**

1    Q.  Well, Mr. Michael has testified and
2  Mr. Homer has testified that Gillen was
3  attempting to try to mirror the relationship
4  that it had with Liberty in 2009.
5      Do you recall that being discussed?
6     MR. RIORDAN: I'm going to object as to
7  form and mischaracterization of the testimony.
8  BY MR. HALLOIN:
9    Q.  And I'm not trying to mischaracterize
10  it, but they said words to that effect?
11    A.  Yes, to that effect. I guess not
12  specific to it, but, you know, they were looking
13  for a surety program to support their needs.
14    Q.  Okay. Now, Mr. Michael has all sorts
15  of documents about the negotiation of the
16  Liberty bond that preceded that environmental
17  bond that was needed. These documents come from
18  that. I assume that's where ultimately it was
19  obtained.
20     I'm trying to figure out what it was
21  that you knew at the time that it came to
22  underwriting about Gillen's existing
23  relationship with Liberty.
24    A.  Not much.
25    Q.  Okay. Did you ask?

**Page 73**

1    A.  Other than why we're getting the
2  opportunity, which was very clear: Liberty
3  declined them on a bid.
4    Q.  For an environmental project?
5    A.  Yeah, for an environmental project.
6    Q.  In the Kinnickinnic River?
7    A.  Yes, correct.
8    Q.  Okay. What else do you recall?
9    A.  That the bid was coming fairly fast. I
10  think it was a quick situation. They were
11  declined and the bid was coming fast, and we had
12  an opportunity to write the account if we could
13  be comfortable with the risk and if we could
14  support their program.
15    Q.  Okay. What was your understanding at
16  that time that Gillen was looking for in terms
17  of its terms?
18    A.  For that project, it was about, I
19  think, roughly a $10 million job, and the
20  project did have an environmental component
21  about it that made Liberty uncomfortable.
22    Q.  Setting aside the environmental
23  component, what was it that Gillen was looking
24  for from F&D?
25    A.  Support of a surety program, but I

**Page 74**

1  don't recall the limits.
2    Q.  What else?
3    A.  Support to issue their bonds, have a
4  relationship with them to issue their bonds.
5    Q.  Did anyone tell you they were looking
6  for terms for those bonds including indemnity
7  arrangements that were similar to what they had
8  with F&D or with Liberty?
9    A.  Yes.
10    Q.  What was your understanding of what the
11  terms were with Liberty?
12    A.  I can't recall any specifics, but they
13  did have an indemnity arrangement with Liberty.
14    Q.  Do you recall what that indemnity
15  arrangement was?
16    A.  There was advice that it was a net
17  worth retention agreement.
18    Q.  Anything else?
19    A.  No.
20    Q.  What was your understanding of the
21  Liberty net worth retention agreement? How did
22  it work?
23    A.  Well, I never saw it so I don't know
24  how it worked.
25    Q.  Why didn't you ever see it?

**Page 75**

1    A.  I didn't see the net worth retention
2  agreement.
3    Q.  It is within the files that have been
4  produced here as part of the underwriting file.
5  Who would have been responsible for collecting
6  that?
7    A.  Tom.
8    Q.  Were you involved in the review of the
9  indemnity arrangement?
10    A.  Not to that degree.
11    Q.  How were you involved?
12    A.  By discussion.
13    Q.  Maybe I don't need to depose you then.
14     I'm trying to figure out where you're
15  involved. I mean, there's a lot of documents
16  that have been exchanged back and forth about
17  what Liberty had and what Gillen was looking for
18  and that go back and forth. Was most of that
19  done by Mr. Homer?
20    A.  Yes.
21    Q.  What was your involvement?
22    A.  Well, I'm Tom's manager so Tom would
23  have had to come to me to clear a project
24  involving environmental. That would certainly
25  have fallen in my direction so he called me, and

Case 2:13-cv-01291-LA   Filed 01/12/18   Page 23 of 42   Document 155-2

Page 76

1 I talked with him about it.
2 Q. What would your involvement be?
3 A. To approve or disapprove the event of
4 underwriting on the project and to support or
5 decline general terms, how large a program we
6 want to have or a single job size or aggregate
7 program and all general terms.
8 Q. What else?
9 A. In this case, the indemnity package
10 that was offered was one that would involve a
11 retention agreement.
12 Q. Did you involve the indemnity that was
13 being sought by Edward E. Gillen?
14 MR. RIORDAN: Object as to form.
15 THE WITNESS: I don't know what you
16 mean by that.
17 BY MR. HALLOIN:
18 Q. There's an e-mail exchange back and
19 forth where provisions of the indemnity
20 agreement that was negotiated with Liberty were
21 actually provided. Mr. Homer testified that he
22 saw it. It was one of the exhibits from his
23 deposition.
24 A. Okay.
25 Q. Did you see any of that?

Page 77

1 A. I didn't see that, no.
2 MR. HALLOIN: Con, if I e-mail that to
3 you, is that something you could print up just
4 so we can verify at a break?
5 MR. RIORDAN: Which exhibit are you
6 referring to?
7 MR. HALLOIN: Do you have the Homer
8 exhibits?
9 MR. RIORDAN: Yeah.
10 MR. HALLOIN: I think it's Exhibit
11 No. 1.
12 MR. RIORDAN: Oh. This one?
13 MR. HALLOIN: Yeah, I think that's the
14 one.
15 MR. RIORDAN: Let me have it, and I'll
16 have copies made.
17 MR. HALLOIN: That would be great.
18 (Whereupon, a short recess was
19 taken.)
20 (Whereupon, Hannigan Deposition
21 Exhibit 8 was marked for
22 identification.)
23 BY MR. HALLOIN:
24 Q. I'll come back to the other topic when
25 the exhibit is done.

Page 78

1 Have you seen Exhibit 8 before?
2 A. Yes.
3 Q. Were you involved in any way with the
4 preparation, execution or issuance of this
5 document?
6 A. Not that I recall.
7 Q. Have you seen this document prior to
8 today?
9 A. Yesterday.
10 Q. Was that the first time you saw it?
11 A. That I can recall. I might have seen
12 it before, but I really don't have much
13 recollection about DLH.
14 Q. Now, Mr. Homer and Mr. Michael have
15 both testified that no bonds were ever issued
16 for DLH.
17 A. Which would maybe be why I wasn't in
18 the loop on DLH.
19 Q. Are you aware of any bonds having been
20 issued?
21 A. I'm not.
22 Q. Do you contend that this is a
23 cross-indemnity agreement as it relates to
24 Edward E. Gillen Company?
25 And if you don't know, I'm not asking

Page 79

1 you to try to give a guess. I'm just asking you
2 if you contend that this is the cross-indemnity
3 agreement that was referenced earlier in your
4 testimony.
5 A. In my testimony?
6 Q. Sorry.
7 When we were referring to the document
8 that -- Exhibit No. -- the memo that was from
9 Mr. Breckke right in front of you.
10 A. Oh, meaning is this the indemnity
11 agreement that Rick references here?
12 Q. Yes.
13 A. It appears to be the case.
14 Q. Okay. Is this a cross-indemnity
15 agreement?
16 A. Yes, it is.
17 Q. Where is the cross-indemnity provision?
18 A. Edward E. Gillen Company is an
19 indemnitor for DLH Construction and Trucking,
20 Inc.
21 Q. Where are you pointing to, sir?
22 A. Line 3, "Edward E. Gillen Company, 218
23 West Becher Street, Milwaukee, Wisconsin, herein
24 called the Indemnitors."
25 That's one of the parties so you have

Page 80

1 the contractor is DLH Construction and Trucking,
2 Inc., and the indemnitors are DLH Construction
3 and Trucking, Inc.
4     Q. I see they're listed, but where do you
5 see a cross-indemnity agreement contained in
6 this agreement?
7     A. Because as indemnitor, Edward E. Gillen
8 is indemnifying for DLH.
9     Q. Gillen is indemnifying for DLH?
10     A. That's correct, yeah.
11     Q. Okay. Is there a document that
12 reflects the reverse?
13     A. Not in my -- not here.
14     Q. Okay. Now I understand what you're
15 saying.
16      So it's your contention that Edward E.
17 Gillen Company has an obligation to indemnify
18 for DLH?
19     A. Yes.
20     Q. Not vice versa?
21     A. Not for this document.
22     Q. Okay. In other words, no
23 indemnification obligation for DLH of Edward E.
24 Gillen Company, correct?
25     A. Correct.

Page 81

1     Q. So when Mr. Breckke said that there was
2 a cross-indemnity from Edward E. Gillen Company
3 to support this operation, meaning DLH, that was
4 incorrect at least based upon Exhibit 8?
5     A. Based upon Exhibit 8, yes.
6     Q. Can you please go back to
7 Mr. Breckke's --
8      MR. RIORDAN: Just a second, Scott.
9 BY MR. HALLOIN:
10     Q. Is it your contention that Jullane
11 Jackson, the daughter, Kristen Jackson or Andrea
12 Jackson are indemnitors pursuant to Exhibit 8?
13     A. Yes.
14     Q. How so?
15     A. They're indemnitors for DLH.
16     Q. For DLH?
17     A. Yes.
18     Q. Okay. Are they indemnitors for Edward
19 E. Gillen Company?
20     A. Not as presented in this.
21     Q. And again, you're not aware of DLH
22 actually obtaining any bonds?
23     A. Not aware of that.
24     Q. Do you contend that they owe any
25 indemnity obligation to DLH for bonds issued by

Page 82

1 F&D?
2     A. They would if there was bonds issued.
3     Q. But there weren't.
4     A. Then there isn't.
5     Q. So they owe no separate indemnity
6 obligation to Edward E. Gillen Company?
7     A. Not for this document.
8     Q. Not from Exhibit 8, okay.
9      Is that something that you would have
10 been aware of in 2009 and 2010?
11     A. I don't recall this.
12     Q. Let me go back to Exhibit No. 7, if I
13 may. This is Exhibit 7 from the deposition of
14 Larry Michael. It was also marked as Homer
15 Exhibit No. 1.
16      Now, the question that was pending
17 before we had it photocopied was had you seen
18 this before.
19     A. Yesterday.
20     Q. Had you seen it prior to yesterday?
21     A. No.
22     Q. Take your time then to review it, and
23 when you're done reviewing it and you feel
24 comfortable testifying about its contents, let
25 me know.

Page 83

1      Do you recall having any conversations
2 with Tom Homer about this document?
3     A. No.
4     Q. Do you recall having any conversations
5 with Richard Breckke about this document?
6     A. No.
7     Q. Do you recall having any conversations
8 with Mr. Homer about the content of this
9 document?
10     A. No.
11     Q. Do you recall having any conversations
12 with Mr. Breckke about the content of this
13 document?
14     A. No.
15     Q. Did anything in this document surprise
16 you when you reviewed it?
17     A. I wouldn't say it's a surprise. It's
18 conveying information.
19      MR. HALLOIN: Mr. Riordan, do you have
20 the other exhibits from the deposition?
21      MR. RIORDAN: Sure.
22      MR. HALLOIN: Have you received that
23 transcript, by the way?
24      MR. RIORDAN: No. In fact, Harry just
25 ordered it yesterday.

Page 84

1    MR. HALLOIN: If I can borrow another
2  one, we can just use that exhibit. If you have
3  it, we can copy it later.
4    MR. RIORDAN: Just trying to put these
5  in order. Two, three, four and five.
6    Those are the only ones I had.
7    I think those are the own ones that you
8  used, right?
9    MR. HALLOIN: Uh-huh.
10   MR. RIORDAN: You don't need these?
11   MR. HALLOIN: No. These are the ones I
12  need. Maybe we can copy it later, or do you
13  want to do it now?
14   MR. RIORDAN: Let me do it now so we're
15  all on the same page.
16       (Whereupon, a short recess was
17        taken.)
18 BY MR. HALLOIN:
19   Q. I'm going to hand you Exhibit No. 4
20  from the Larry Michael deposition which was also
21  Mr. Homer's Exhibit No. 3 and give you a moment
22  to read this, and the question is going to be:
23  Have you seen this before.
24       Have you seen that exhibit before?
25   A. No, I have not.

Page 85

1    Q. Was it one of the items you reviewed
2  yesterday with Counsel?
3    A. I don't recall. It may be.
4    Q. Did Mr. Homer have the ability to
5  approve terms of an agreement of indemnity or
6  net worth retention agreement with customers in
7  general?
8    MR. RIORDAN: Object as to form.
9  Asking about two separate agreements.
10   THE WITNESS: Tom would have needed to
11  discuss that with me.
12 BY MR. HALLOIN:
13   Q. Okay. Did he have the authority,
14  though? Different question. Could he?
15   A. No.
16   Q. Based upon what?
17   A. A net worth retention agreement is
18  something we generally have a higher level of
19  involvement on.
20   Q. Okay. Are there circumstances where
21  you don't?
22   A. Not that I can think of.
23   Q. Do you recall any conversations with
24  Mr. Homer or Mr. Breckke about this document,
25  Michael Exhibit 4?

Page 86

1    MR. RIORDAN: The one you just read.
2    THE WITNESS: No.
3  BY MR. HALLOIN:
4    Q. Do you have any recollection of
5  conversations with Mr. Homer or Mr. Breckke
6  about what Edward E. Gillen Company was seeking
7  in the form of an indemnity agreement or net
8  worth retention agreement?
9    A. So yes, as far as a net worth retention
10  agreement, yes, I was aware that they wanted a
11  net worth retention agreement.
12   Q. What do you recall?
13   A. That they were seeking a net worth
14  retention agreement, and we were comfortable
15  with a $7.5 million level.
16   Q. How did you become comfortable with a
17  $7.5 million level?
18   A. Based on the financial information that
19  was presented.
20   Q. Okay. What financial information was
21  presented?
22   A. It would have been the most recent
23  audited financial statement.
24   Q. Anything else?
25   A. The overall underwriting of the

Page 87

1  account.
2    Q. Would you have considered accounts
3  receivable as part of determining whether or not
4  that $7.5 million was acceptable?
5    A. As part of the financial statement.
6    Q. Okay. How would you consider accounts
7  receivable? Same as we described it before, you
8  would have looked at the bulk amount, the 30,
9  60, 90-day bad collections, turnover?
10   A. Yes.
11   Q. Those all would have been
12  considerations that were formulated by you
13  before accepting the $7.5 million number?
14   A. The decision to accept the 7.5 would
15  have been at the recommendation of Tom, and Tom
16  sought to write the account, meet their needs,
17  provide their bond program, and we would be
18  comfortable with a limit of $7.5 million on the
19  net worth retention agreement.
20   Q. Did Tom discuss with you specific needs
21  that might be needed regarding the terms of the
22  indemnity agreement or the net worth retention
23  agreement?
24   A. No.
25   Q. Now, both Mr. Homer and Mr. Michael

Case 2:15-cv-01291-LA   Filed 01/12/18   Page 26 of 42   Document 155-2

Page 88

1 have provided testimony as to the rule of
2 business setbacks as it relates to the net worth
3 retention agreement. Have you discussed that
4 with your counsel?
5    A. No.
6    Q. Do you recall having any discussions
7 with Mr. Homer or Mr. Breckke or Mr. Michael in
8 that regard?
9    A. No. About business setbacks, no.
10    Q. Well, you said the word "business
11 setbacks." Is that --
12    A. I'm echoing what you just said, right.
13    Q. Whether or not business setbacks would
14 be included or a triggering event, do you recall
15 anything about that?
16    A. No, I don't.
17    Q. Do you have any reason to refute the
18 testimony that's been provided by Mr. Homer or
19 Mr. Michael in terms of --
20    A. I've not seen it, but I don't have any
21 reason to.
22    Q. Did Mr. Homer have the authority to
23 speak for F&D in terms of negotiations of the
24 indemnity agreement and net worth retention
25 agreement?

Page 89

1    A. Yes.
2    Q. Did Mr. Michael?
3    A. As a representative.
4    Q. So the answer's yes?
5    A. Yes.
6    Q. The next marked exhibit, I told you
7 that I withheld half of the file only because it
8 appeared to be clearly separate so perhaps you
9 can identify what this is.
10      (Whereupon, Hannigan Deposition
11        Exhibit 9 was marked for
12        identification.)
13 BY MR. HALLOIN:
14    Q. Exhibit 2 was the first part of the
15 file which was the accounts receivable, and then
16 there was this document. Now, this one does
17 come up with a Bates number P 877, and it is an
18 F&D file. What is it?
19    A. This is a contractor summary sheet
20 outlining basic insight about a customer.
21    Q. Who would have prepared this Exhibit
22 No. 9?
23    A. The information would have been entered
24 by the underwriter.
25    Q. So that would have been Mr. Homer or

Page 90

1 Mr. Breckke?
2    A. Correct.
3    Q. And where would they obtain the
4 underlying information?
5    A. In the information gathered from the
6 customer.
7    Q. Now, it appears to be a review of three
8 financial statements; do you see that?
9    A. I do.
10    Q. Now, your earlier testimony was that
11 you recall reviewing a financial statement. Is
12 it possible you reviewed multiple financial
13 statements?
14    A. Yes, but the net worth selection, the
15 number, would have been based on the most
16 current financial statement.
17    Q. Okay. Did this document, Exhibit 9,
18 play a role in determining that $7.5 million net
19 worth?
20      MR. RIORDAN: The document is dated
21 months after, about a year, over a year after.
22      THE WITNESS: I don't recall if this
23 document played a role. Well, actually, it
24 wouldn't have been prepared at the time.
25

Page 91

1 BY MR. HALLOIN:
2    Q. I know that that's what your counsel
3 just said.
4    A. No, no, I'm just saying -- I'm trying
5 to think through. They wanted to bid a job, and
6 we were talking about terms back on a bid in
7 Milwaukee in early '09, right?
8    Q. So it may not have been considered as
9 part of the indemnity agreement, but it was
10 considered as part of the bond issuance process
11 for 31st Street?
12    A. Well, it would have been considered for
13 part of the underwriting process.
14    Q. Of that bond?
15    A. Well, underwriting process of the
16 account.
17    Q. Okay. Would an account be underwritten
18 if this summary sheet showed a net worth of less
19 than $7.5 million?
20      MR. RIORDAN: Objection. Calls for
21 speculation on the part of the witness,
22 incomplete hypothetical, calls for an opinion.
23 BY MR. HALLOIN:
24    Q. It's a fair question. You can answer.
25    A. I don't understand it. Say that again.

Case 2:15-cv-01291-LA   Filed 01/12/18   Page 27 of 42   Document 153-2

Page 92

1　Q. Would Gillen have been underwritten if
2 this document showed a net worth of less than
3 $7.5 million?
4　　MR. RIORDAN: Same objection.
5　　THE WITNESS: I don't know how to
6 answer that. You're changing the underwriting
7 ingredients so we'd possibly have a different
8 answer.
9 BY MR. HALLOIN:
10　Q. Well, you have a section that's
11 entitled "Analysis of Financial Statements."
12　A. Yes.
13　Q. Do you see anything here to indicate
14 that the net worth was less than 7.5 million for
15 any of those years in that analysis?
16　A. No.
17　Q. If the analysis had shown a net worth
18 of less than $7.5 million, would Gillen have
19 been underwritten?
20　A. I don't know the answer to that.
21　Q. Why?
22　A. Because Tom was handling the
23 underwriting. He would have to decide if he
24 wanted to proceed on the account.
25　Q. Would you have expected him to?

Page 93

1　A. I'm not sure. I don't know.
2　Q. Well, the net worth retention agreement
3 that ultimately was put in place here has a
4 $7.5 million number. Tom would have been aware
5 of that, correct?
6　A. Yes.
7　Q. And you would have been aware of that?
8　A. Yes.
9　Q. Because that was ultimately -- you were
10 involved in that decision?
11　A. That's correct.
12　Q. Would you have expected Mr. Homer or
13 Mr. Breckke to tell you that the net worth had
14 fallen below $7.5 million before issuing a bond
15 for the 31st Street project based upon his
16 analysis?
17　A. Yes.
18　Q. Something you would have expected them
19 to share, right?
20　A. Yes.
21　Q. It's not a trick question.
22　A. I'm not sure what you're even referring
23 to.
24　Q. Sometimes if I take off the lawyer hat
25 and just ask it in human terms, you're

Page 94

1 considering issuing a large bond for the 31st
2 Street project, right?
3　A. Okay. So you're switching gears.
4 You're talking about the underwriting on the
5 original account.
6　Q. Yeah.
7　A. Now we're going to a different
8 timeline.
9　Q. F&D is.
10　A. Different timeline, okay.
11　Q. Now, if you look at Page 2 of this
12 document, you can see it lists Thomas Homer and
13 Patrick Hannigan as the underwriting sign-on?
14　A. Uh-huh.
15　Q. This is the document that might have
16 led me to believe you might have been off on
17 dates because the document itself is 2010, but
18 this is a document that would have been
19 something that would have been prepared by
20 either Mr. Homer -- well, by Mr. Homer or you,
21 right?
22　A. By Mr. Homer.
23　Q. Okay. And it would have been prepared
24 in 2010, correct?
25　　MR. RIORDAN: You mean this document?

Page 95

1　　MR. HALLOIN: Yeah. It says, "Created
2 5/27/2010."
3　　MR. RIORDAN: So you're asking --
4　　THE WITNESS: It might have been
5 printed that day or created, meaning they
6 created it, generated it.
7 BY MR. HALLOIN:
8　Q. Okay. Are you able to tell --
9　A. The information might be in the system,
10 but they created it in a print version 5/27/10.
11　Q. Well, isn't it safe to assume from
12 Page 1, an analysis of financial statements,
13 that if it has an analysis of a May 31, 2010
14 financial statement, it would have been created
15 at some point in 2010?
16　A. Yeah, yes. So there is a 3/31
17 financial statement, not a May, yes.
18　Q. Sorry. A March.
19　A. Yeah, so apparently then it was entered
20 in and then generated after entry of the March
21 information.
22　Q. So isn't it a fair statement then that
23 Mr. Homer would have still been at F&D at that
24 time to do the analysis that's contained in this
25 document?

**Page 96**

1    A.  I don't know if he was there or not.
2  Rick could have done it.
3    Q.  Is there any way to tell who did
4  prepare the document?
5    A.  Not that I know of.
6    Q.  Is it something you might have done it?
7    A.  No, I wouldn't have done it.
8    Q.  What does it mean then on Page 2 when
9  it says, "Underwriter sign-off"?
10   A.  It refers to the authority levels.
11   Q.  Okay.  If Eric had replaced Tom,
12  wouldn't Eric be listed in that spot?
13   A.  Rick.
14   Q.  Rick.  Sorry.
15   A.  Yes.
16   Q.  So is it a fair statement that Tom
17  would have been the person who prepared this
18  document?
19   A.  That I don't know.  I don't know.
20   Q.  Okay.
21   A.  When did Tom leave?
22   Q.  I don't have a precise date.  I just
23  know that your years are at variance.  That's
24  what I'm trying to figure out.  It's a long time
25  ago.

**Page 97**

1     Now, 2010 is the start of the 31st
2  Street project.  I'm assuming that before you
3  issue a bond of this nature -- it's a large
4  bond -- that the account itself gets looked at
5  first?
6    A.  Correct.
7    Q.  What type of things would you look at?
8    A.  Current financial information, current
9  job schedules, current banking information,
10  whatever was materially important to evaluating
11  the risk potential of the account.
12   Q.  And that's because although you may
13  have an indemnity agreement, that document could
14  just in a general sense be a couple of years
15  old, right?
16   A.  The indemnity agreement?
17   Q.  Yes.
18   A.  Right.
19   Q.  The process for underwriting is that
20  you obtain an indemnity agreement and other
21  documents that are necessary, but that then
22  stays in place and bonds may be written in the
23  future based upon those documents, right?
24   A.  Yes.
25   Q.  But I'm assuming that a company like

**Page 98**

1  F&D wants to catch up on what the financial
2  status is before issuing a big bond?
3    A.  We often do.
4    Q.  And they do a secondary review,
5  correct?
6    A.  We do an update.
7    Q.  Okay.  And would that have been done by
8  somebody like Mr. Homer or Mr. Breckke or
9  yourself?
10   A.  Yes.
11   Q.  And I'm assuming you would look at
12  financial statements?
13   A.  Whatever we've received as current and
14  requested, yes.
15   Q.  And that review would have been done by
16  somebody who was used to the account, correct,
17  familiar with the account ideally?
18   A.  Ideally, yes.
19   Q.  Which is why in this instance, it would
20  have been done by Mr. Homer or Mr. Breckke,
21  depending upon who was working there?
22   A.  Correct.
23   Q.  And you may have been involved in the
24  process as well?
25   A.  Yes.

**Page 99**

1    Q.  And that's because you would have been
2  familiar with the agreement of indemnity and the
3  net worth retention agreement that existed here?
4    A.  Yes.
5    Q.  And you would have expected Mr. Homer
6  or Mr. Breckke to be familiar with those
7  documents as well?
8    A.  Yes.
9    Q.  Including the fact that the net worth
10  retention agreement has a $7.5 million
11  triggering event number, correct?
12   A.  Yes.
13   Q.  That's something that you would have
14  expected Mr. Homer to know, Mr. Breckke to know
15  and that you, yourself, would have been able to
16  know or at least quickly learn from reviewing
17  the file?
18   A.  Yes.
19   Q.  And that review prior to issuing a bond
20  for 31st Street would have involved making sure
21  that the net worth number hasn't already been
22  triggered, in other words, that they're not
23  below that number, correct?
24   A.  Yes.
25   Q.  And if they were below that number,

Case 2:13-cv-01291-LA   Filed 01/12/18   Page 29 of 42   Document 155-2

Page 100

1 that's something that you would want to know,
2 correct?
3     A.   Yes.
4     Q.   And that is something that you would
5 have evaluated in the context of issuing a bond,
6 correct?
7     A.   Yes.
8     Q.   From this document, do you see anything
9 to lead you to believe that the net worth
10 retention agreement had been violated?
11       MR. RIORDAN:   You mean in terms of the
12 $7.5 million number?
13       MR. HALLOIN:   Uh-huh, yes.
14       MR. RIORDAN:   So you're asking him is
15 there anything in this document that would lead
16 him to believe that the net worth of Gillen had
17 fallen below $7.5 million?
18       MR. HALLOIN:   Yes.
19       THE WITNESS:   No.
20 BY MR. HALLOIN:
21     Q.   And this document would have included
22 an analysis of accounts receivable, correct?
23     A.   Yes.
24     Q.   Because accounts receivable would have
25 been reflected in the financial statements,

Page 101

1 correct?
2     A.   Yes.
3     Q.   Now, going back to Michael -- we're
4 done with that exhibit now and done with the
5 underwriting file and we're done with new
6 exhibits so I just have some mop-up questions
7 for you.
8       Mr. Michael in Exhibit No. 4 talks
9 about the written agreement for Gillen from
10 Zurich.
11       Do you have the exhibit handy?
12       MR. RIORDAN:   I thought you said we
13 were done with exhibits.
14       MR. HALLOIN:   No new exhibits.
15       MR. RIORDAN:   This is the March 25th,
16 2009?
17       MR. HALLOIN:   Yes.
18 BY MR. HALLOIN:
19     Q.   If you look at the third paragraph,
20 it's kind of a run-on. It starts with: "The
21 only difference I'm observing is an update on
22 the retention of capital amount. Tangible net
23 worth is described in the agreement that
24 reflects the condition of the most recent
25 in-house year-end 12/31/2008 balance sheet

Page 102

1 provided by Gillen."
2       Do you see that?
3     A.   Yes.
4     Q.   Do you recall reviewing that balance
5 sheet as part of your decision to impose a
6 $7.5 million number?
7       MR. RIORDAN:   Object as to form.
8       THE WITNESS:   I would have reviewed it.
9 BY MR. HALLOIN:
10     Q.   Okay. Last series of questions.
11       I lied. I'm sorry. It's a quick
12 exhibit.
13       (Whereupon, Hannigan Deposition
14         Exhibit 10 was marked for
15         identification.)
16 BY MR. HALLOIN:
17     Q.   This is the legal term Exhibit 10 for
18 what we call an orphan, just a random document
19 within the document production.
20       Can you identify it for me?
21     A.   It's a Rate Determination Sheet.
22     Q.   What do you mean by that?
23     A.   In order to determine what rate to use
24 for our customer, we complete this document.
25     Q.   Who's "we"?

Page 103

1     A.   The underwriter.
2     Q.   Okay. And it indicates on Line 4:
3 Principal's net worth, 10,322,705 for fiscal
4 year ending December 31, 2010. Do you see that?
5     A.   I do.
6     Q.   Was that a calculation that was done by
7 Mr. Breckke?
8     A.   Yes.
9     Q.   And it says right underneath, "Total
10 allowed net worth for base rating purposes,
11 10,322,705"?
12     A.   I see that.
13     Q.   Do you have any reason to dispute the
14 accuracy of that calculation?
15     A.   No.
16     Q.   Do you believe Mr. Breckke would have
17 included accounts receivable for purposes of
18 that computation?
19     A.   Yes.
20     Q.   And it's correct that the pricing of
21 the bond that was ultimately issued for 31st
22 Street was based upon the assumption that there
23 was a total allowed net worth for base rating
24 purposes for 10,322,705?
25     A.   Yes.

Page 104

1   Q. Now we're to the last series of
2 questions. Let me make sure that before we do I
3 don't have any other orphans.
4   Can you go back to Michael Exhibit 7?
5 Three questions.
6   Do you recall having any conversation
7 with Tom Homer about any of the terms and
8 conditions that are referenced in this e-mail in
9 which you told Mr. Homer those terms and
10 conditions were not acceptable?
11   A. So I've not seen this.
12   Q. No, but I did give you time to read it
13 in detail.
14   A. But, I mean, I had not seen this in
15 2009.
16   Q. I'm expecting you're going to say no
17 because you didn't see it.
18   A. I did not have any discussions about
19 those specific points, or at least I don't
20 recall any discussions about those specific
21 points.
22   Q. And my question is more specific.
23   You said earlier you didn't have any
24 discussions with them. I realize that this may
25 be implied, but we're lawyers so we're anal

Page 105

1 retentive.
2   You did not tell Mr. Homer that these
3 terms were unacceptable, correct?
4   A. No.
5   Q. You did not tell Mr. Michael that these
6 terms were unacceptable?
7   A. No.
8   Q. You did not tell Randy Brehmer that
9 these terms were unacceptable?
10   A. No.
11   Q. You did not tell Gary Jackson that
12 these terms were unacceptable?
13   A. No.
14   Q. You did not tell Jullane Jackson, the
15 mother, that these terms were unacceptable?
16   A. No.
17   Q. You did not tell Jullane Jackson, the
18 daughter, that these terms were unacceptable?
19   A. No.
20   Q. You did not tell Andrea Jackson or
21 Kristen Jackson that these terms were
22 unacceptable?
23   A. No.
24   Q. You did not tell Richard Zirbel, David
25 Miller or Tom Gaulke or Ron Carter or Steve

Page 106

1 Vanderbloemen that these terms were
2 unacceptable?
3   A. No.
4   MR. HALLOIN: Sir, you've been a very
5 polite and nice witness.
6   Thank you for your time. I have no
7 further questions.
8   I will reserve the right to keep it
9 open in the event that some new documents are
10 produced, but hopefully we're done, and thank
11 you for coming here today.
12   MR. RIORDAN: I just have a couple of
13 follow-up questions.
14   EXAMINATION
15 BY MR. RIORDAN:
16   Q. In this document which is Exhibit No. 9
17 where it says, "Underwriter Sign-Off" on the
18 second page, do the dates there refer to the
19 dates on which both you and Tom Homer originally
20 signed off on the initial underwriting of the
21 account?
22   A. Yes.
23   Q. And you recall that the date of the GIA
24 or the date the GIA was signed was April 28th of
25 2009?

Page 107

1   A. Yes.
2   Q. And that would be consistent with the
3 fact that the original underwriting occurred --
4 the sign-offs occurred on these dates, correct?
5   A. That's correct.
6   MR. RIORDAN: Thank you.
7   MR. HALLOIN: Thank you, Con.
8   (Whereupon, the proceedings
9   concluded at 12:44 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Case 2:13-cv-01291-LA   Filed 01/12/18   Page 31 of 42   Document 155-2

Page 108

```
1        C E R T I F I C A T E
2
3      I, BRENDA S. TANNEHILL, do hereby certify
4   that heretofore, to-wit, on May 23, 2017,
5   personally appeared before me, at 180 North
6   Stetson Avenue, Chicago Illinois, PATRICK
7   HANNIGAN, in a cause now pending and
8   undetermined in the United States District
9   Court, Eastern District of Wisconsin, wherein
10  FIDELITY AND DEPOSIT COMPANY OF MARYLAND, a
11  Maryland Corporation, is the Plaintiff, and
12  EDWARD E. GILLEN COMPANY, et al. are the
13  Defendants.
14      I further certify that the said witness
15  was first duly sworn to testify the truth, the
16  whole truth and nothing but the truth in the
17  cause aforesaid; that the testimony then given
18  by said witness was reported stenographically by
19  me in the presence of the said witness, and
20  afterwards reduced to typewriting by
21  Computer-Aided Transcription, and the foregoing
22  is a true and correct transcript of the
23  testimony so given by said witness as aforesaid.
24      I further certify that the signature to
25  the foregoing deposition was waived by counsel
```

Page 109

```
1   for the respective parties.
2       I further certify that the taking of this
3   deposition was pursuant to Notice, and that
4   there were present at the deposition the
5   attorneys hereinbefore mentioned.
6       I further certify that I am not counsel
7   for nor in any way related to the parties to
8   this suit, nor am I in any way interested in the
9   outcome thereof.
10      IN TESTIMONY WHEREOF:  I have hereunto
11  set my hand and affixed my seal this 25th day of
12  May, 2017.
13
14
15
16          Brenda S. Tannehill
17
18
19
20
21
22
23
24
25
```

Case 2:13-cv-01291-LA   Filed 01/12/18   Page 32 of 42   Document 155-2

**WORD INDEX**

< $ >
**$10** 73:*19*
**$7.5** 86:*15, 17* 87:*4, 13,
*18* 90:*18* 91:*19* 92:*3,
*18* 93:*4, 14* 99:*10*
100:*12, 17* 102:6

< 0 >
**084-003336** 1:*25*
**09** 91:*7*

< 1 >
**1** 3:*11* 50:*15, 18* 55:*12*
66:*21* 77:*11* 82:*15*
95:*12*
**10** 3:*20* 30:*4* 95:*10*
102:*14, 17*
**10,322,705** 103:*3, 11, 24*
**10:42** 1:*17*
**102** 3:*20*
**106** 3:*5*
**11** 30:*2, 5*
**12** 101:*25*
**12:44** 107:*9*
**13-CV-1291** 1:*5*
**14** 25:*5*
**18** 2:*4*
**180** 1:*16* 108:*5*
**1982** 7:*6*
**1986** 7:*9* 8:*2, 22*
**1994** 8:*23*

< 2 >
**2** 3:*12* 58:*18* 59:*10*
67:*7* 89:*14* 94:*11* 96:*8*
**2002** 9:*3, 10*
**2004** 56:*2* 66:*25*
**2005** 9:*12* 10:*7, 13*
*56:14*
**2008** 10:*14* 11:*1, 19, 20*
12:*3* 24:*8, 11* 25:*2, 19*
46:*13* 61:*2, 9* 101:*25*
**2009** 15:*9* 16:*16* 24:*8,
11* 25:*19* 46:*13* 57:*7*
72:*4* 82:*10* 101:*16*
104:*15* 106:*25*
**2010** 30:*2* 32:*1, 24, 25*
33:*2* 36:*4* 39:*11* 46:*11,
12* 82:*10* 94:*17, 24*
95:*2, 13, 15* 97:*1* 103:*4*
**2011** 10:*14* 11:*20* 12:*5*
28:*17* 29:*5, 22* 30:*11*
32:*1* 39:*20* 46:*11* 61:*2,
9*
**2012** 58:*1, 5*
**2014** 9:*17* 10:*7*
**2016** 9:*18*
**2017** 1:*17* 24:*9* 108:*4*
109:*12*
**218** 79:*22*

< 23 >
**23** 1:*17* 108:*4*
**25th** 101:*15* 109:*11*
**26** 5:*1* 37:*17*
**27** 95:*2, 10*
**2755** 4:*18*
**28th** 106:*24*

< 3 >
**3** 3:*13* 53:*13* 54:*9*
64:*11, 13* 66:*17* 79:*22*
84:*21* 95:*16*
**30** 61:*19* 87:*8*
**31** 95:*13, 16* 101:*25*
103:*4*
**312** 2:*6*
**31st** 5:*19* 6:*14* 13:*8*
14:*5* 19:*6* 28:*23* 29:*6,
7* 33:*3* 38:*4, 15* 42:*1, 2*
43:*17* 44:*25* 45:*7, 10*
46:*2, 10* 47:*9, 15* 48:*18*
49:*7* 56:*23* 91:*11*
93:*15* 94:*1* 97:*1* 99:*20*
103:*21*
**3700** 2:*4*

< 4 >
**4** 3:*14* 66:*4* 67:*9*
84:*19* 85:*25* 101:*8*
103:*2*
**400** 37:*8*
**414** 2:*14*

< 5 >
**5** 3:*4, 15* 66:*4* 67:*13*
95:*2, 10*
**50** 3:*11*
**503** 2:*12*
**52** 8:*6*
**53202** 2:*13*
**565-8445** 2:*6*
**59** 3:*12*

< 6 >
**6** 3:*16* 68:*13, 15, 23, 25*
**60** 61:*20* 87:*9*
**60565** 4:*19*
**60601** 2:*5*
**64** 3:*13*
**66** 3:*14, 15*
**68** 3:*16, 17*

< 7 >
**7** 3:*17* 68:*17, 19* 69:*6,
14* 82:*12, 13* 104:*4*
**7.5** 87:*14* 92:*14*
**70s** 28:*6*
**732-2424** 2:*14*
**77** 3:*18*

< 8 >
**8** 3:*18* 77:*21* 78:*1*
81:*4, 5, 12* 82:*8*

**839** 2:*12*
**877** 89:*17*
**89** 3:*19*

< 9 >
**9** 3:*19* 89:*11, 22* 90:*17*
106:*16*
**90** 61:*20*
**90-day** 87:*9*

< A >
**a.m** 1:*17*
**ability** 63:*16* 66:*20*
68:*6* 85:*4*
**able** 32:*3* 51:*12* 56:*9*
67:*5* 95:*8* 99:*15*
**absent** 44:*19*
**accept** 87:*14*
**acceptable** 87:*4* 104:*10*
**accepting** 87:*13*
**access** 52:*19*
**account** 6:*1, 6* 15:*6, 7,
23* 16:*3, 10, 14* 51:*5, 16*
52:*4, 5, 7, 10* 55:*11*
56:*13* 57:*13* 58:*7* 60:*1*
71:*14* 73:*12* 87:*1, 16*
91:*16, 17* 92:*24* 94:*5*
97:*4, 11* 98:*16, 17*
106:*21*
**account,** 57:*9*
**accountant** 34:*25* 35:*6,
22, 24*
**accounting** 35:*6*
**accounts** 60:*18* 61:*5, 9*
87:*2, 6* 89:*15* 100:*22,
24* 103:*17*
**accuracy** 103:*14*
**achieve** 71:*23*
**acting** 35:*13*
**action** 4:*21*
**actual** 30:*2*
**ad** 64:*24*
**added** 4:*24*
**addition** 43:*6*
**address** 4:*16*
**advice** 74:*16*
**affixed** 109:*11*
**aforesaid** 108:*17, 23*
**agency** 15:*5* 52:*20*
55:*23* 67:*16*
**agent** 56:*2, 16, 17*
**agents** 14:*19*
**aggregate** 76:*6*
**aging** 60:*2* 61:*20, 23*
**ago** 11:*8* 24:*25* 29:*19*
36:*24* 96:*25*
**agreement** 23:*10, 11, 23*
63:*2* 66:*21, 24* 67:*8*
74:*17, 21* 75:*2* 76:*11,
20* 78:*23* 79:*3, 11, 15*
80:*5, 6* 85:*5, 6, 17* 86:*7,
8, 10, 11, 14* 87:*19, 22, 23*
88:*3, 24, 25* 91:*9* 93:*2*

97:*13, 16, 20* 99:*2, 3, 10*
100:*10* 101:*9, 23*
**agreements** 65:*2* 67:*15,
18, 25* 85:*9*
**ahead** 24:*23* 69:*21*
**al** 108:*12*
**alerting** 44:*6*
**allowed** 103:*10, 23*
**Amended** 4:*21*
**amendment** 66:*25* 67:*7*
**amount** 61:*18, 23* 87:*8*
101:*22*
**amounts** 61:*19*
**anal** 104:*25*
**Analysis** 92:*11, 15, 17*
93:*16* 95:*12, 13, 24*
100:*22*
**analyzed** 61:*6*
**Andrea** 34:*13* 45:*16*
47:*24* 81:*11* 105:*20*
**Andrew** 58:*10*
**Angie** 12:*15, 19* 13:*19*
**answer** 16:*24* 22:*14, 18,
20* 24:*23* 26:*3* 69:*21*
91:*24* 92:*6, 8, 20*
**answer's** 89:*4*
**Anybody** 13:*4* 25:*20*
30:*18*
**apparently** 95:*19*
**APPEARANCES** 2:*1*
**appeared** 89:*8* 108:*5*
**appears** 46:*8* 59:*16*
60:*1* 64:*4* 79:*13* 90:*7*
**appointments** 31:*17*
**approach** 38:*10*
**appropriate** 50:*6*
**approval** 71:*9*
**approve** 76:*3* 85:*5*
**approximately** 8:*20, 23*
**April** 106:*24*
**April-ish** 46:*12*
**areas** 20:*21* 22:*3*
**arrangement** 74:*13, 15*
75:*9*
**arrangements** 74:*7*
**aside** 62:*11* 73:*22*
**asked** 56:*3* 57:*9*
**asking** 19:*11* 54:*24*
56:*16* 64:*19* 65:*22*
78:*25* 79:*1* 85:*9* 95:*3*
100:*14*
**aspect** 26:*20*
**assesses** 14:*20*
**assignment** 63:*21*
**assistant** 8:*24*
**associated** 19:*3* 63:*22*
**assume** 32:*15* 72:*18*
95:*11*
**assumed** 15:*6*
**assumes** 69:*20*
**assuming** 8:*15* 97:*2, 25*
98:*11*

Case 2:13-cv-01291-LA   Filed 01/12/18   Page 33 of 42   Document 155-2

assumption  46:7 103:22
attach  11:21
attached  3:22
attempting  72:3
attend  30:5
attendance  28:14
attended  27:2 30:4
ATTORNEYS  2:2 109:5
audited  86:23
August  8:2
authority  10:11 85:13
  88:22 96:10
Avenue  1:16 2:4 108:6
aware  39:12, 15, 19
  42:9, 12, 14, 16 56:22
  63:1, 5, 7, 24 66:23
  67:6, 12 68:7 78:19
  81:21, 23 82:10 86:10
  93:4, 7

< B >

back  20:23 31:20 32:1,
  9 33:20 36:3 40:16
  55:8 62:9 75:16, 18
  76:18 77:24 81:6
  82:12 91:6 101:3 104:4
backup  56:13, 19, 21, 25
bad  87:9
balance  41:23 101:25
  102:4
banking  52:12 97:9
base  103:10, 23
based  52:15 81:4, 5
  85:16 86:18 90:15
  93:15 97:23 103:22
basic  58:7 89:20
basically  15:22
basis  22:3, 21
Bates  66:8 89:17
Becher  79:23
Begins  30:15
behavior  43:24
believe  15:16 27:2
  29:11 31:11 32:2
  33:17 38:3 39:9, 13, 16
  42:7, 10 45:11 50:20
  53:17, 25 54:19 59:24
  94:16 100:9, 16 103:16
bell  49:4
Beltsville  7:7
Ben  37:17, 21 48:17
Bereshein  12:20
B-E-R-E-S-H-E-I-N
  12:20
best  28:25
better  16:15
bid  71:9, 14 73:3, 9, 11
  91:5, 6
bidding  62:19 71:8
big  98:2
bit  6:25 23:3
bond  5:18 11:4, 12
  14:1 43:10 46:1 66:22

60:20 62:5 72:16, 17
  87:17 91:10, 14 93:14
  94:1 97:3, 4 98:2
  99:19 100:5 103:21
bonds  5:22 6:10 13:7
  19:16 44:1 57:16 60:9
  70:2, 15 74:3, 4, 6
  78:15, 19 81:22, 25
  82:2 97:22
book  60:22
books  35:23
borrow  84:1
Boston  7:8, 10, 16, 22
  9:5
break  29:8 50:5 77:4
Breakwater  29:9, 10, 23
  30:1 33:3 38:4 39:4, 5
  43:17 49:7
Breckenridge  4:18
Breckke  12:12 13:11,
  14 14:6, 23 30:12 33:4
  47:2, 8, 12 51:6, 7, 13,
  15 53:3 56:12 60:8
  65:6 69:3, 17 79:9
  81:1 83:5, 12 85:24
  86:5 88:7 90:1 93:13
  98:8, 20 99:6, 14 103:7,
  16
Breckke's  81:7
Brehmer  15:5 52:20
  55:22 67:16 105:8
BRENDA  1:15, 24
  108:3 109:16
bridge  28:23 29:7, 24
  38:15, 17
broader  26:19
build  38:9
building  17:12, 17
bulk  87:7
bunch  6:24
Burgos  12:24
business  4:13 14:20
  17:7, 8, 14, 19, 19 18:4
  58:2 62:1, 18 88:2, 9,
  10, 13

< C >

calculation  103:6, 14
calendar  31:18, 20, 25
  32:5
caliber  9:23
call  102:18
called  1:12 4:25 5:10
  41:10 71:7 75:25 79:24
Calls  91:20, 22
capital  101:22
capture  51:19
care  17:6 32:16
career  8:10
Carter  53:15 54:11
  105:25
case  4:16 5:5 20:18

21:4 27:18 76:9 79:13
cases  4:14 19:15 22:12
catch  98:1
categories  26:23
cause  108:7, 17
cell  49:23
centuries  11:7
certain  6:7
certainly  75:24
certificates  7:12
certify  108:3, 14, 24
  109:2, 6
CFO  30:13, 19 31:5
  34:2, 21 35:1, 7, 9, 13,
  20, 21, 24 40:25, 25
  42:15 44:14 45:19
  48:6, 10 49:2 53:14
chain  10:17
chance  50:21 64:16
  68:22
changing  92:6
charge  10:20
Charlie  23:4
check  31:21
Chicago  1:16 2:5 9:14,
  18 10:8 24:12, 14 56:1
  108:6
Chris  12:14, 18 13:18
circumstances  85:20
Civil  1:13
claim  18:17
claims  5:8 19:4
clear  36:22 45:9 70:9
  73:2 75:23
clearly  65:2 89:8
client  20:3 46:14, 18
clip  69:8
clipped  69:9
codes  66:8
collectability  61:24
collected  59:6
collecting  75:5
collections  87:9
College  7:8, 10, 16, 22
  8:9
Columbia  9:8
come  33:20 62:9 72:17
  75:23 77:24 89:17
comfortable  73:13
  82:24 86:14, 16 87:18
coming  12:23 38:25
  60:16 61:12 73:9, 11
  106:11
command  10:17
commencement  45:24
communications  20:1
companies  62:13
COMPANY  1:3, 5 4:22
  6:17 7:18, 24 8:1 13:8
  18:1 21:1 26:18 34:2
  36:6 41:13, 17 42:25
  43:9 47:15 48:4, 15
  55:22 57:1, 21 58:5

60:9 62:23 63:6, 20, 23
  67:23 78:24 79:18, 22
  80:17, 24 81:2, 19 82:6
  86:6 97:25 108:10, 12
Company's  70:1
compiled  55:13
Complaint  4:21
complete  102:24
compliment  16:21
component  73:20, 23
computation  103:18
Computer-Aided  108:21
Con  19:24 20:2, 8
  21:12 77:2 107:7
concerned  62:17
concluded  107:9
condition  101:24
conditions  104:8, 10
confident  29:13
confusing  65:21
consciousness  52:6
consider  26:5, 11, 13
  87:6
consideration  60:19
  69:2, 16, 20
considerations  87:12
considered  16:15 62:7
  87:2 91:8, 10, 12
considering  94:1
consisted  38:9
consistent  55:20, 23
  56:5 107:2
constant  12:5, 6
CONSTRUCTION  1:8
  6:8, 20 14:8 53:21
  62:15 67:19 79:19
  80:1, 2
contact  18:25 19:1
  20:4, 25 26:18 33:25
  34:20 44:9, 11, 13, 16
  45:1 49:24 53:3
contacts  45:15 49:18
contain  65:1
contained  80:5 95:24
contend  78:22 79:2
  81:24
contending  67:10
content  21:17, 24, 25
  22:1 36:4 44:4 83:8, 12
contention  63:15 66:19
  67:4 68:3 80:16 81:10
contents  82:24
context  100:5
Contract  9:19, 21
contracting  7:24
contractor  52:14 80:1
  89:19
Contractors  9:22, 24
  14:19
controller  53:15
conveniently  53:20
conversation  36:19 37:1
  104:6

conversations 26:25
27:4, 25 28:3, 11 33:21
34:6, 13 46:21 47:17
48:21 49:10, 13 57:12,
20 83:1, 4, 7, 11 85:23
86:5
conveying 83:18
copies 3:23, 23 77:16
copy 53:6 84:3, 12
CORNELIUS 2:3
corporate 65:13 67:18
68:1
Corporation 1:4, 6, 9
108:11
correct 5:19 6:14 10:9
13:21 15:24 24:13
34:7 39:7 45:20 46:15
60:4, 5 64:1 73:7
80:10, 24, 25 90:2 93:5,
11 94:24 97:6 98:5, 16,
22 99:11, 23 100:2, 6,
22 101:1 103:20 105:3
107:4, 5 108:22
counsel 22:10 23:25
25:24 85:2 88:4 91:2
108:25 109:6
counsel's 22:11
couple 37:5 41:4 97:14
106:12
couple-minute 50:5
COURT 1:1 108:9
Courts 1:14
cover 65:3
covered 45:9
CPA 30:23 35:16, 18
41:12
Created 95:1, 5, 6, 10, 14
credit 14:21
criordan@SRCattorneys.
com 2:7
CRISHAM 2:2
cross-corporate 62:22
63:5, 16 64:2, 25 65:7
cross-indemnity 78:23
79:2, 14, 17 80:5 81:2
CRR 1:24
CSR 1:15, 24
curious 52:25
current 90:16 97:8, 8, 9
98:13
customary 53:2
customer 57:3 89:20
90:6 102:24
customers 14:22 85:6

< D >
Dan 11:3, 4, 12 13:25
dance 21:16
date 15:10, 13 28:25
29:2 36:1 96:22
106:23, 24
dated 90:20

dates 32:4, 14, 21, 24
51:11 61:19 94:17
106:18, 19 107:4
daughter 25:5 28:7, 13
33:22, 23 34:21 45:4,
16 47:22, 24 48:1
81:11 105:18
daughters 34:14 62:16,
22 63:2 65:8, 11, 24
David 105:24
day 36:22 95:5 109:11
December 103:4
decide 92:23
decision 62:5 87:14
93:10 102:5
decisions 60:8
decline 76:5
declined 73:3, 11
Defendants 1:9 2:16
108:13
defer 15:13
definite 41:22
degree 71:18 75:10
degrees 7:10
delivered 44:5
departed 16:4
departure 15:7
depending 12:7 98:21
depose 75:13
deposed 15:12 16:19
17:1 18:15 23:9
DEPOSIT 1:3 4:22
7:17 8:1 42:24 43:9
108:10
deposition 1:11 3:10
20:9, 17 21:6, 11, 19
23:16, 20, 22 24:7
26:21 46:22 50:14
59:9 64:12 66:3 68:14,
18 76:23 77:20 82:13
83:20 84:20 89:10
102:13 108:25 109:3, 4
depositions 1:14 19:14,
16
describe 14:17 35:3
42:3
described 38:5 87:7
101:23
description 38:8
detail 104:13
Determination 102:21
determine 61:23 102:23
determining 60:19 87:3
90:18
develop 14:20
difference 35:7 101:21
Different 79:8 114:18
10:24 15:13, 17 16:13
17:13 29:2, 2 30:24
35:5, 8 85:14 92:7
94:7, 10
differently 23:3 35:14

difficult 12:22
digest 26:14
direction 75:25
director 9:10
disapprove 76:3
Disclosure 5:1
discuss 20:15, 18 21:6,
18 22:1 41:13 85:11
87:20
discussed 21:11, 13
22:17 38:2 72:5 88:3
discussing 38:3
discussion 10:2 75:12
discussions 22:10 47:16
69:24 70:13 88:6
104:18, 20, 24
dispute 4:13 103:13
disputed 54:21
distinguishing 40:13
distributed 53:8
distribution 10:21
DISTRICT 1:1, 2, 13
108:8, 9
divorce 25:15
DLH 1:8 6:8, 10, 19
14:8 62:14 63:25 64:2,
3, 5, 21 65:11, 12, 14, 24
66:14 67:19 68:1
78:13, 16, 18 79:19
80:1, 2, 8, 9, 18, 23 81:3,
15, 16, 21, 25
document 4:25 50:23
51:3 52:23 53:6, 20
62:12 63:3, 8, 11, 14
69:4, 18 78:5, 7 79:7
80:11, 21 82:7 83:2, 5,
9, 13, 15 85:24 89:16,
18 90:17, 20, 23 92:2
94:12, 15, 17, 18, 25
95:25 96:4, 18 97:13
100:8, 15, 21 102:18, 19,
24 106:16
documents 22:11 55:22
26:1, 5 27:13 31:7
51:13 53:11 55:12
59:1, 17 63:12 64:9
66:9, 9, 13 67:5 68:4
72:15, 17 75:15 97:21,
23 99:7 106:9
doing 25:1 51:23
dollars 60:17
driving 65:16
D's 46:9
duly 4:2 5:11 108:15

< E >
earlier 29:17 46:12
79:3 90:10 104:23
earliest 51:12
early 57:7 91:7
easier 6:22 15:19
East 9:20

EASTERN 1:2 108:9
echoing 88:12
education 7:3
EDWARD 1:5 6:16, 17
13:7 26:18 30:21
35:21 47:15 55:21
57:21 58:5 60:9 62:23
63:6 67:22 69:25
76:13 78:24 79:18, 22
80:7, 16, 23 81:2, 18
82:6 86:6 108:12
effect 72:10, 11
efforts 26:6
eight 12:4, 10 23:6
36:24
either 13:8 14:25
21:12 25:12 40:2 60:7
62:20 94:20
eldest 28:7
electronic 31:22, 25
else's 25:20
e-mail 49:22 76:18
77:2 104:8
emphasis 24:7
Enclosed 67:17
encourage 43:25
encouraged 44:7
enforce 63:16 66:20
67:5, 11 68:6
entered 89:23 95:19
entitled 66:20 67:11
92:11
entry 95:20
environmental 71:11
72:16 73:4, 5, 20, 22
75:24
Environmental-oriented
71:12
equipment 52:12
Eric 12:18 13:11, 13
16:5 50:24 96:11, 12
errors 35:9 62:14
essentially 65:23
establish 61:25
established 57:7
et 108:12
evaluated 100:5
evaluating 97:10
event 40:14 76:3 88:14
99:11 106:9
events 23:6 24:8 26:15
40:11 58:3
everybody 57:17
exactly 54:7
examination 1:12 3:2
5:13 106:14
examined 5:11
exchange 76:18
exchanged 75:16
execution 67:20 78:4
executive 16:10, 14
Exh 3:11, 12, 13, 14, 15,
16, 17, 18, 19, 20

Exhibit 50:*15*, *18* 55:*12*
59:*10* 62:*10* 64:*11*, *13*
65:*25* 66:*1*, *17* 67:*9*, *13*
68:*13*, *15*, *19*, *23*, *25*
69:*6*, *14* 77:*5*, *10*, *21*, *25*
78:*1* 79:*8* 81:*4*, *5*, *12*
82:*8*, *12*, *13*, *15* 84:*2*, *19*,
*21*, *24* 85:*25* 89:*6*, *11*,
*14*, *21* 90:*17* 101:*4*, *8*,
*11* 102:*12*, *14*, *17* 104:*4*
106:*16*
exhibits 3:*22* 50:*7* 66:*4*
76:*22* 77:*8* 83:*20*
101:*6*, *13*, *14*
exist 25:*9* 27:*15* 60:*23*
63:*12*
existed 63:*12* 99:*3*
existing 72:*22*
expected 92:*25* 93:*12*,
*18* 99:*5*, *14*
expecting 104:*16*
experience 58:*17*
experienced 26:*22*
expert 17:*20*
explain 41:*24*
explained 71:*15*
extends 14:*21*

< F >
face 57:*18*, *18*
fact 17:*22* 18:*7* 19:*17*
22:*6* 23:*2* 83:*24* 99:*9*
107:*3*
factor 62:*4*
facts 15:*19* 17:*23*
20:*18* 21:*17* 22:*7*, *9*
Fair 18:*19* 40:*6* 49:*12*
55:*9*, *16* 62:*2*, *3*, *6*
91:*24* 95:*22* 96:*16*
fairly 73:*9*
fall 29:*5* 56:*2*
fallen 75:*25* 93:*14*
100:*17*
familiar 37:*9*, *10* 54:*4*, *7*,
*11* 98:*17* 99:*2*, *6*
familiarity 67:*24*
family 25:*12* 27:*18*
far 15:*16* 27:*15* 31:*20*
46:*22* 86:*9*
fast 73:*9*, *11*
faster 50:*8*
federal 62:*19*
feel 82:*23*
FIDELITY 1:*3* 4:*22*
7:*17*, *25* 8:*1* 42:*24*
43:*9* 108:*10*
field 10:*20* 53:*20*
fight 19:*25*
figure 23:*1*, *7* 24:*1*
29:*21* 30:*8* 32:*3*, *14*
46:*19* 52:*23* 66:*12*
72:*20* 75:*14* 96:*24*

file 4:*14* 31:*9* 46:*8*
51:*12* 59:*15*, *16*, *17*
62:*11* 64:*23* 67:*3* 68:*9*
75:*4* 89:*7*, *15* 99:*17*
101:*5*
filed 4:*21* 5:*1* 18:*18*
19:*15*
files 52:*20* 65:*1* 75:*3*
financial 41:*10* 43:*16*
44:*3* 52:*11* 59:*18*
86:*18*, *20*, *23* 87:*5* 90:*8*,
*11*, *12*, *16* 92:*11* 95:*12*,
*14*, *17* 97:*8* 98:*1*, *12*
100:*25*
financially 41:*13*
find 67:*17*
fine 20:*3* 22:*20*
finish 62:*12*
firing 57:*5*
firm 35:*6*, *16*, *18*
first 5:*10* 7:*15*, *21*
11:*21* 15:*1* 19:*7* 25:*6*
26:*18*, *20*, *20* 27:*2* 31:*4*
38:*3* 45:*23* 46:*17* 49:*6*
55:*1*, *2*, *8* 62:*12*, *13*
78:*10* 89:*14* 97:*5*
108:*15*
firsthand 49:*17* 55:*10*,
*15*, *17* 56:*7*
fiscal 103:*3*
five 18:*21* 84:*5*
flag 59:*7*
focus 6:*23* 26:*24* 27:*21*
30:*6* 32:*17*
focused 10:*14* 23:*23*
focusing 31:*1* 45:*6*
46:*17*
follows 5:*12*
follow-up 106:*13*
foregoing 108:*21*, *25*
forget 37:*7*, *11*
form 70:*8*, *17*, *22* 72:*7*
76:*14* 85:*8* 86:*7* 102:*7*
formulated 87:*12*
Forniere 13:*1*
F-O-R-N-I-E-R-E 13:*2*
forth 75:*16*, *18* 76:*19*
four 84:*5*
Fourth 4:*21*
frame 47:*13*
freshman 25:*7*
front 79:*9*
full-time 7:*15*, *21*
funny 37:*12*
further 40:*5* 106:*7*
108:*14*, *24* 109:*2*, *6*
future 97:*23*
futz 18:*24*

< G >
GARY 1:*6* 27:*1*, *2*, *5*, *6*,
*21*, *22*, *25* 28:*5*, *10* 34:*6*

45:*2*, *15* 47:*18* 54:*15*,
*22* 62:*15* 105:*11*
gathered 90:*5*
Gaulke 37:*6* 48:*12*
54:*1*, *2*, *12* 55:*6* 105:*25*
gears 94:*3*
general 13:*8* 14:*5* 15:*1*
20:*16* 22:*16*, *19* 36:*17*
39:*25* 41:*16* 49:*14*
66:*21* 67:*8* 76:*5*, *7*
85:*7* 97:*14*
generally 11:*23* 22:*25*
23:*8* 24:*10* 27:*22* 38:*7*
41:*7*, *8* 46:*14*, *19* 58:*22*
85:*18*
generated 95:*6*, *20*
gentleman 65:*5*
getting 20:*20* 71:*9* 73:*1*
GIA 106:*23*, *24*
GILLEN 1:*5* 5:*23*, *24*
6:*13*, *17*, *17* 13:*8* 14:*4*,
*25* 15:*6*, *23* 26:*18*
30:*21* 32:*13* 35:*13*, *21*,
*23* 36:*5* 39:*17* 43:*12*,
*14*, *15* 44:*23* 47:*15*
49:*14*, *19* 55:*11*, *21*
57:*21* 58:*5* 59:*4* 60:*9*
62:*23* 63:*6* 64:*3*, *3*, *6*,
*20* 65:*10*, *13*, *24* 67:*22*
69:*25* 70:*14*, *20* 71:*8*,
*15* 72:*2* 73:*16*, *23*
75:*17* 76:*13* 78:*24*
79:*18*, *22* 80:*7*, *9*, *17*, *24*
81:*2*, *19* 82:*6* 86:*6*
92:*1*, *18* 100:*16* 101:*9*
102:*1* 108:*12*
Gillen's 37:*3* 72:*22*
Give 7:*4* 37:*5* 50:*21*
60:*19* 64:*16*, *17* 65:*12*
79:*1* 84:*21* 104:*12*
given 36:*23* 50:*22*
61:*22* 64:*20* 69:*3*, *17*,
*20* 108:*17*, *23*
gives 53:*12* 67:*20*
giving 56:*17*
go 14:*9* 24:*23* 31:*20*
36:*3*, *4* 39:*20*, *25* 40:*5*,
*16* 41:*7* 46:*22* 51:*24*
52:*1*, *24* 53:*13* 55:*8*
58:*7*, *16* 66:*10*, *14*
67:*13* 69:*21* 75:*18*
81:*6* 82:*12* 104:*4*
going 4:*10* 6:*24* 8:*13*
12:*7*, *21*, *23* 20:*19*
24:*22* 25:*10* 26:*2*, *19*
28:*4*, *8* 29:*25* 32:*24*
33:*19* 35:*11* 36:*3* 37:*5*
46:*22* 50:*4*, *21* 52:*24*
55:*19* 62:*9* 66:*1*, *14*
70:*21* 72:*6* 84:*19*, *22*
94:*7* 101:*3* 104:*16*
Good 8:*12* 16:*18* 25:*20*

31:*24* 32:*11* 44:*5* 49:*8*
graduated 7:*6*, *16*, *22*
graduating 7:*8*
Great 8:*12* 77:*17*
Greensclade 12:*15*
G-R-E-E-N-S-L-A-D-E
12:*17*
Greg 19:*5*
ground 19:*25*
guarantees 63:*17*, *22*
65:*8*
guess 11:*24* 12:*3* 18:*13*
72:*11* 79:*1*
guidelines 60:*23*
guy 11:*5*

< H >
Haley 10:*18*, *19* 13:*25*
half 20:*14* 89:*7*
halfway 16:*25*
HALLOIN 2:*10*, *11* 3:*4*
4:*3*, *6*, *10*, *20* 5:*14*, *24*
6:*2* 10:*1*, *4* 11:*9*, *11*
18:*24* 19:*8*, *11*, *23* 20:*7*,
*22* 21:*2*, *5* 22:*5*, *13*, *24*
24:*24* 25:*3* 26:*4*, *9*, *10*
27:*12*, *20* 46:*2*, *5* 50:*9*,
*11*, *17* 59:*12* 61:*1* 64:*2*,
*7*, *8*, *15*, *22* 65:*15*, *19*, *25*
66:*6* 68:*13*, *17*, *21* 69:*9*,
*13*, *23* 70:*4*, *11*, *18* 71:*1*
72:*8* 76:*17* 77:*2*, *7*, *10*,
*13*, *17*, *23* 81:*9* 83:*19*,
*22* 84:*1*, *9*, *11*, *18* 85:*12*
86:*3* 89:*13* 91:*1*, *23*
92:*9* 95:*1*, *7* 100:*13*, *18*,
*20* 101:*14*, *17*, *18* 102:*9*,
*16* 106:*4* 107:*7*
hand 66:*1* 84:*19* 109:*11*
handing 50:*18*
handle 5:*17* 71:*14*
handled 5:*7* 15:*5*
handles 6:*6*
handling 5:*4* 15:*7*
92:*22*
handy 101:*11*
HANNIGAN 1:*11* 3:*3*,
*10* 4:*5* 5:*9* 50:*14* 59:*9*
64:*12* 66:*3* 68:*14*, *18*
77:*20* 89:*10* 94:*13*
102:*13* 108:*7*
H-A-N-N-I-G-A-N 4:*9*
happen 8:*7*
happened 31:*13* 65:*5*
happening 24:*2*
hard 32:*13* 37:*6*
Harry 19:*8*, *10*, *13* 20:*8*
21:*12* 83:*24*
hat 93:*24*
head 9:*19*
health 25:*12*
hear 8:*13*

heard 24:*3*
he'll 20:*2*
helpful 35:*16* 53:*11*
helps 36:*1* 50:*3*
hereinbefore 109:*5*
heretofore 108:*4*
hereunto 109:*10*
Hey 15:*19*
hide 48:*7*
high 7:*2, 6, 6*
higher 85:*18*
hire 35:*5*
history 67:*21*
hold 43:*1*
home 4:*15* 17:*12, 17, 18*
Homer 12:*11* 14:*6*
  15:*12* 46:*25* 47:*1, 1, 3,*
  *6, 7* 49:*15* 51:*15* 52:*1*
  60:*7* 69:*3, 17, 25* 70:*14*
  71:*4* 72:*2* 75:*19* 76:*21*
  77:*7* 78:*14* 82:*14* 83:*2,*
  *8* 85:*4, 24* 86:*5* 87:*25*
  88:*7, 18, 22* 89:*25*
  93:*12* 94:*12, 20, 20, 22*
  95:*23* 98:*8, 20* 99:*5, 14*
  104:*7, 9* 105:*2* 106:*19*
Homer's 21:*6, 18* 84:*21*
hopeful 71:*16*
hopefully 106:*10*
hour 1:*17*
hours 20:*14, 14*
human 93:*25*
hypothetical 91:*22*

< I >
ID 3:*9*
idea 59:*15*
ideally 98:*17, 18*
identification 50:*16*
  52:*8* 59:*11* 64:*14* 66:*5*
  68:*16, 20* 77:*22* 89:*12*
  102:*15*
identified 5:*3* 13:*6*
  39:*22* 61:*5*
identify 12:*8* 17:*10*
  36:*1* 89:*9* 102:*20*
Illinois 1:*16* 2:*5* 4:*19*
  9:*15* 35:*5* 108:*6*
immediate 10:*12*
impact 41:*22* 43:*16*
implied 104:*25*
important 15:*18* 26:*24*
  32:*21* 97:*10*
impose 102:*5*
include 49:*22*
included 88:*14* 100:*21*
  103:*17*
including 74:*6* 99:*9*
incomplete 91:*22*
incorrect 46:*7* 81:*4*
increase 56:*4*
indemnification 80:*23*

indemnify 80:*17*
indemnifying 80:*8, 9*
indemnities 64:*25* 65:*3*
indemnitor 65:*14* 79:*19*
  80:*7*
Indemnitors 79:*24* 80:*2*
  81:*12, 15, 18*
indemnity 23:*10, 23*
  56:*4* 62:*21, 22* 63:*1, 6,*
  *17, 22* 64:*3, 20, 21, 25*
  65:*1, 7, 12, 23* 66:*14, 22*
  67:*8, 14, 18, 25* 74:*6, 13,*
  *14* 75:*9* 76:*9, 12, 19*
  79:*10* 81:*25* 82:*5* 85:*5*
  86:*7* 87:*22* 88:*24* 91:*9*
  97:*13, 16, 20* 99:*2*
indicate 92:*13*
indicated 33:*24* 34:*5*
  53:*18*
indicates 103:*2*
individual 1:*7, 7*
individuals 10:*24*
influence 23:*5* 35:*12*
inform 43:*16*
information 51:*19, 23,*
  *25* 52:*9, 11, 12, 12, 13, 16,*
  *17* 58:*8, 14, 19* 59:*6, 18,*
  *20, 25* 60:*6* 61:*10*
  67:*20* 83:*18* 86:*18, 20*
  89:*23* 90:*4, 5* 95:*9, 21*
  97:*8, 9*
informed 56:*18*
ingredients 92:*7*
in-house 101:*25*
initial 106:*20*
insight 56:*18* 89:*20*
insinuating 23:*24*
instance 98:*19*
institution 7:*4* 57:*15*
instruct 22:*15* 26:*3*
instructing 22:*14*
insurance 35:*8* 67:*2*
intended 16:*22*
intentions 70:*1*
interested 10:*5* 57:*2*
  109:*8*
internally 53:*9*
introduced 35:*14*
investigation 47:*14*
involve 76:*10, 12*
involved 5:*20, 21* 6:*7*
  13:*20, 23* 23:*9* 38:*22*
  47:*12* 54:*20* 56:*13*
  75:*8, 11, 15* 78:*3* 93:*10*
  98:*23* 99:*20*
involvement 6:*16, 19*
  75:*21* 76:*2* 85:*19*
Involving 17:*15* 64:*3*
  75:*24*
issuance 78:*4* 91:*10*
issue 17:*5* 20:*5* 60:*20*
  74:*3, 4* 97:*3*

issued 5:*18* 56:*23*
  63:*18* 78:*15, 20* 81:*25*
  82:*2* 103:*21*
issues 19:*3, 5* 21:*4* 25:*8,*
  *10, 12, 15, 15*
issuing 93:*14* 94:*1* 98:*2*
  99:*19* 100:*5*
items 85:*1*
its 70:*16* 73:*17* 82:*24*

< J >
JACKSON 1:*6, 7* 27:*1,*
  *5, 6, 6, 14, 16, 17, 19, 21,*
  *22, 25* 28:*3, 5, 7, 13*
  30:*7* 31:*2* 33:*16, 22, 25*
  34:*7, 13, 16, 20* 36:*9*
  39:*6* 40:*2, 16* 42:*10*
  44:*9* 45:*2, 4, 15, 16, 16,*
  *17, 17* 47:*18, 20, 22, 24*
  48:*1* 54:*15, 22* 58:*11*
  81:*11, 11, 12* 105:*11, 14,*
  *17, 20, 21*
Jacksons 28:*8*
Jackson's 28:*5, 10* 62:*16*
Jefferson 2:*12*
Jerry 10:*17* 13:*25*
Jim 12:*20* 13:*19*
Joachim 12:*14*
J-O-A-C-H-I-M 12:*15*
job 7:*15, 21, 25* 8:*20*
  25:*15* 41:*25* 45:*24*
  46:*1* 71:*7, 22* 73:*19*
  76:*6* 91:*5* 97:*9*
jobs 8:*14*
Joint 36:*6*
JULLANE 1:*7* 28:*3, 5,*
  *7, 8, 13* 30:*7* 31:*2*
  33:*16, 22, 25* 34:*20*
  36:*8* 39:*6* 40:*2, 16*
  42:*10* 44:*9* 45:*4, 15, 16*
  47:*20, 22* 81:*10* 105:*14,*
  *17*
Justin 12:*23* 13:*19*

< K >
keep 31:*17* 56:*18* 106:*8*
keeps 38:*25*
kid 64:*25*
kids 24:*19*
kind 4:*23* 49:*18* 57:*15*
  101:*20*
Kinnickinnic 73:*6*
knew 35:*15* 72:*21*
knock 26:*23*
know 4:*13* 5:*2, 2* 6:*22,*
  *25* 8:*5* 13:*10, 11* 14:*9,*
  *12* 15:*14, 17* 18:*20*
  21:*7* 22:*6* 23:*16* 24:*11*
  25:*8* 27:*7, 15, 16, 22, 23*
  29:*3* 32:*16, 19, 21* 34:*8,*
  *24* 35:*2, 24* 37:*10, 19*
  38:*24* 56:*6, 10, 14*
  57:*11* 58:*11, 13, 19, 22*

59:*5, 5* 63:*2* 66:*23*
  67:*3, 21* 68:*8* 69:*2, 16*
  72:*12* 74:*23* 76:*15*
  78:*25* 82:*25* 91:*2* 92:*5,*
  *20* 93:*1* 96:*1, 5, 19, 19,*
  *23* 99:*14, 14, 16* 100:*17*
knowledge 14:*4* 52:*3*
  55:*10, 11* 56:*7* 63:*20*
knows 22:*7* 52:*4*
Koepsell 37:*17* 48:*17*
Kristen 34:*16* 45:*17*
  48:*1* 81:*11* 105:*21*
K-R-I-S-T-E-N 34:*17*

< L >
Lane 4:*18*
large 61:*16* 76:*5* 94:*1*
  97:*3*
largest 59:*4*
Larry 23:*21* 30:*11*
  33:*4* 36:*11* 47:*3, 7*
  52:*10* 55:*22* 56:*9* 57:*8,*
  *13* 58:*2* 67:*16* 82:*14*
  84:*20*
late 15:*9* 46:*11* 61:*13*
lawsuit 18:*17*
lawyer 23:*3* 93:*24*
lawyers 19:*24* 24:*1*
  104:*25*
lay 7:*3*
layman's 14:*17*
lead 100:*9, 15*
learn 99:*16*
learned 63:*10*
leave 96:*21*
leaves 47:*8*
led 41:*12* 94:*16*
left 15:*15* 51:*15*
legal 102:*17*
legs 50:*6*
letter 49:*23* 67:*15*
level 6:*5* 85:*18* 86:*15,*
  *17*
levels 96:*10*
Liberty 56:*9* 57:*5* 65:*3*
  67:*1* 68:*4* 71:*9, 17*
  72:*4, 16, 23* 73:*2, 21*
  74:*8, 11, 13, 21* 75:*17*
  76:*20*
LICENSE 1:*25*
licensures 7:*13*
lied 102:*11*
limit 87:*18*
limits 74:*1*
line 8:*15* 79:*22* 103:*2*
lines 12:*21*
list 44:*20* 53:*22* 56:*16*
  59:*4*
listed 53:*19* 80:*4* 96:*12*
lists 94:*12*
literally 16:*23*
litigated 18:*12, 16*

little 6:25 12:21 15:18
23:2
living 24:14, 16
LLC 6:17
locate 51:13
long 8:8 9:1 20:13
29:19 96:24
look 11:4 25:22 50:25
54:8 59:13, 19 60:15
61:22, 24 64:16 69:6
94:11 97:7 98:11
101:19
looked 87:8 97:4
looking 7:25 39:23
46:13 51:11 70:20
71:25 72:12 73:16, 23
74:5 75:17
loop 78:18
losing 41:17, 24
losses 41:25 42:3
lost 69:12
lot 19:24 29:1 41:17
52:4, 22 75:15
Lotus 32:9

< M >
Maggie 13:1, 19
maintained 59:15
making 46:7 99:20
man 28:24 48:9
Managed 35:23
management 10:21, 22
57:7
manager 6:5 8:24 9:17
33:10 53:18 75:22
managing 9:10
manner 21:13
manual 61:3
March 9:18 95:18, 20
101:15
Marine 6:17 36:6
Mark 65:25 68:17
MARKED 3:9 50:15
59:10 64:13 66:4
68:15, 19 77:21 82:14
89:6, 11 102:14
Market 9:19, 21
markets 14:19
Maryland 1:3, 3 4:22
7:7 9:6, 8 108:10, 11
materially 97:10
math 25:2
matter 17:12, 14 18:4,
16 22:16, 19 26:9 40:9
matters 18:12, 25 19:4
44:3
McKee 21:20
mean 5:23 20:24 26:7,
13 29:1 75:15 76:16
94:25 96:8 100:11
102:22 104:14
Meaning 56:15 79:10

81:3 95:5
means 14:18 56:14
meet 20:8, 11, 13 87:16
meeting 27:3 28:15, 16,
18, 20 29:11 30:4, 6, 9,
24, 25 31:8 32:25 33:3
36:2, 4, 9, 12, 16, 18, 22
37:23 39:11, 18 40:3
41:9, 12 42:17 43:11,
15 44:20 45:23 48:23
49:5, 6, 11 55:2
meetings 30:5 32:4, 17,
22 39:21 40:7, 9, 11, 14
41:8 45:12 48:24
54:19 57:24, 25
member 25:13
memo 51:24 79:8
memory 25:19, 20 40:6,
10
mentioned 38:14 53:14
109:5
merged 40:7
met 29:3, 4 35:19
53:16, 24 54:10 55:1, 3
57:18
Michael 23:17 30:12
33:4 47:4, 7 49:15
51:25 52:10 53:3, 5
55:22 56:1 57:13
67:16 72:1, 14 78:14
82:14 84:20 85:25
87:25 88:7, 19 89:2
101:3, 8 104:4 105:5
Michael's 23:16, 20
52:20
mid 15:9 28:6
Middle 9:19, 21 25:6
Mike 11:4, 12 14:1
Miller 48:14 49:2
53:25 54:12 55:6
105:25
Miller's 48:22
million 73:19 86:15, 17
87:4, 13, 18 90:18
91:19 92:3, 14, 18 93:4,
14 99:10 100:12, 17
102:6
Millions 41:20
Milwaukee 2:13 79:23
91:7
minus 12:10
mirror 72:3
mischaracterization 72:7
mischaracterize 72:9
mischaracterizing 45:22
Mistake 38:16 39:1
65:6
mistakenly 50:23
mistakes 52:22, 24
misunderstood 56:20
mix 61:15
model 17:19

moment 62:10 66:15
84:21
money 41:18, 24
months 7:23, 23 90:21
mop-up 101:6
mother 105:15
multiple 59:17, 18 60:3
90:12
municipalities 19:15
MURDOCK 2:10
Mutual 56:10 68:5

< N >
name 4:4 30:13, 19
31:6 37:7 48:22 49:3
54:4
named 28:6 53:15
names 11:22 37:5
46:23 48:7 53:12 54:7,
8, 10
Naperville 4:19
national 9:22
nature 33:10 41:9 97:3
nauseam 64:24
necessary 97:21
need 4:15, 16 75:13
84:10, 12
needed 24:25 72:17
85:10 87:21
needs 72:13 87:16, 20
negotiated 76:20
negotiation 72:15
negotiations 88:23
net 23:11 74:16, 21
75:1 85:6, 17 86:7, 9,
11, 13 87:19, 22 88:2,
24 90:14, 18 91:18
92:2, 14, 17 93:2, 13
99:3, 9, 21 100:9, 16
101:22 103:3, 10, 23
never 74:23
new 57:6 101:5, 14
106:9
nice 8:12 19:23 28:24
106:5
night 4:23
nine 23:7
Normally 4:25 24:6
51:8
North 1:16 2:4, 12
108:5
notable 54:3
notes 31:11, 14 32:10
Notice 109:3
noticeably 44:19
NUMBER 3:9 32:22
66:8 67:7 87:13 89:17
90:15 93:4 99:11, 21,
23, 25 100:12 102:6
numbers 66:11

< O >

object 20:19 22:3
24:22 26:2 70:8, 17, 22
72:6 76:14 85:8 102:7
Objection 69:19 91:20
92:4
obligation 24:4 80:17,
23 81:25 82:6
obligations 6:7
observing 101:21
obtain 70:16 71:16
90:3 97:20
obtained 8:19 22:9
55:12 72:19
obtaining 81:22
obviously 24:8
occurred 23:21 45:24
107:3, 4
o'clock 1:17
offered 76:10
office 16:4
Oh 13:15 57:19 77:12
79:10
Okay 4:20 6:11 9:9, 16
12:25 13:15 15:21
18:2, 9, 23 21:2, 22
23:12, 24 26:1, 17 29:6,
13 30:6 31:3, 5 35:20
36:3 39:16 40:13
41:21 43:6 45:8 47:9,
16 48:21 49:8 50:3, 9
51:1 53:5, 11, 18 57:4,
23 58:4, 7 60:3 62:9
72:14, 25 73:8, 15
76:24 79:14 80:11, 14,
22 81:18 82:8 85:13,
20 86:20 87:6 90:17
91:17 94:3, 10, 23 95:8
96:11, 20 98:7 102:10
103:2
old 8:5 23:7 24:21
25:6 97:15
omissions 35:9
once 17:11
ones 18:15 60:3 84:6, 7,
11
Ontario 9:11
open 106:9
operation 62:24 63:7
81:3
opinion 41:11 91:22
opportunity 56:17
71:13 73:2, 12
opposed 64:20 65:24
options 41:4
order 84:5 102:23
ordered 83:25
original 3:22, 22 5:25
6:11, 13 44:21, 22, 24
45:6, 8 46:24 70:25
71:2, 3 94:5 107:3
originally 5:3 63:12
106:19

Case 2:13-cv-01291-LA   Filed 01/12/18   Page 38 of 42   Document 155-2

orphan 102:*18*
orphans 104:*3*
Ortman 12:*12, 14*
O-R-T-M-A-N 12:*14*
outcome 109:*9*
outlining 89:*20*
Outlook 32:*8*
outside 26:*7* 35:*6, 18*
41:*12* 42:*15*
overall 61:*15* 86:*25*
overlapped 16:*2*
owe 81:*24* 82:*5*
owned 62:*15*
owner 19:*20*
owners 61:*16, 16* 65:*13*
owns 42:*24*

< P >
p.m 107:*9*
package 76:*9*
Page 53:*13* 54:*9* 55:*8*
58:*16, 18* 69:*12* 84:*15*
94:*11* 95:*12* 96:*8*
106:*18*
pages 65:*3*
Pam 67:*15*
paper 43:*10* 52:*16* 69:*8*
papers 68:*11*
paragraph 58:*18* 101:*19*
paragraphs 4:*24*
parent 25:*13*
Part 17:*23* 26:*5* 27:*17*
38:*16* 39:*1* 51:*4* 60:*8*
62:*7, 16* 63:*13* 67:*1*
75:*4* 87:*3, 5* 89:*14*
91:*9, 10, 13, 21* 102:*5*
particularly 23:*6*
parties 28:*19* 79:*25*
109:*1, 7*
party 17:*25* 18:*2, 5*
Paschen 36:*5, 6*
passed 50:*22*
Pat 19:*6, 6*
PATRICK 1:*11* 3:*3*
4:*5* 5:*9* 94:*13* 108:*6*
P-A-T-R-I-C-K 4:*8*
Paul 56:*2, 3*
pause 24:*24* 28:*4*
pending 82:*16* 108:*7*
people 12:*22* 14:*3*
32:*23* 37:*11* 43:*25* 54:*5*
period 10:*5* 12:*8* 16:*1*
25:*21* 35:*10* 46:*12, 17*
47:*6, 13*
periods 46:*9*
person 49:*1* 53:*16*
96:*17*
personal 4:*11* 17:*5, 5,
17* 25:*10* 56:*4* 62:*21*
63:*1, 17*
personally 18:*2* 108:*5*
pertaining 1:*14*

phone 49:*23*
photocopied 82:*17*
place 8:*10* 9:*1* 56:*9*
93:*3* 97:*22*
Plaintiff 1:*4* 2:*8* 108:*11*
play 90:*18*
played 90:*23*
please 4:*3, 7* 35:*3*
64:*10* 70:*3, 10* 81:*6*
plus 12:*10*
point 4:*17, 23* 7:*6* 34:*1,
11* 35:*11* 64:*18* 71:*21*
95:*15*
pointing 79:*21*
points 104:*19, 21*
polite 106:*5*
portions 48:*18*
position 9:*11* 11:*13, 21,
24* 16:*9, 15* 43:*1, 4*
61:*22*
possible 29:*1, 16* 37:*13*
49:*1* 51:*14, 20* 90:*12*
Possibly 37:*15* 49:*6*
60:*12* 68:*12* 92:*7*
potential 32:*4* 97:*11*
Potentially 32:*6*
potentials 34:*19*
pounds 37:*8*
practice 31:*12* 61:*8*
preceded 72:*16*
precise 32:*22* 96:*22*
predates 44:*21* 47:*9*
preparation 78:*4*
prepare 20:*9* 96:*4*
prepared 89:*21* 90:*24*
94:*19, 23* 96:*17*
presence 22:*12* 26:*8*
108:*19*
present 28:*18* 30:*7, 10*
33:*1, 16* 39:*17, 22*
54:*16* 109:*4*
presented 5:*6* 81:*20*
86:*19, 21*
president 9:*15, 19* 10:*7*
11:*14* 27:*10, 11* 33:*5*
34:*21* 43:*5* 45:*18* 48:*3,
14*
pretty 9:*1* 12:*6* 40:*10*
65:*2*
previous 49:*11*
pricing 103:*20*
Principal's 103:*3*
print 66:*10* 77:*3* 95:*10*
printed 95:*5*
prior 4:*17* 20:*9* 22:*8*
25:*23* 44:*25* 45:*5, 24*
78:*7* 82:*20* 99:*19*
private 61:*16*
privilege 18:*25, 25*
21:*17* 22:*4, 21*
privileged 20:*1, 20* 22:*3,
10* 26:*3*

probably 12:*24* 18:*22*
25:*6* 40:*8* 57:*16* 58:*24*
61:*3*
problematic 61:*24*
Procedure 1:*13* 35:*4*
proceed 92:*24*
proceedings 107:*8*
process 14:*9* 30:*8* 44:*6,
23, 25* 45:*7* 46:*18*
54:*22* 91:*10, 13, 15*
97:*19* 98:*24*
produced 51:*14* 59:*2, 6*
63:*13* 66:*10* 75:*4*
106:*10*
production 59:*8* 63:*14*
102:*19*
profile 14:*21*
program 67:*2* 72:*13*
73:*14, 25* 76:*5, 7* 87:*17*
progressed 30:*3*
project 5:*19* 6:*14* 13:*9*
14:*5* 29:*7, 8, 10, 12, 24*
30:*1, 2* 33:*10, 11, 13*
38:*4, 8, 9, 10* 39:*2, 3*
41:*25* 42:*1, 2* 45:*1, 10*
46:*4* 47:*16* 48:*19*
53:*18* 54:*23* 56:*24*
71:*10, 11, 12* 73:*4, 5, 18,
20* 75:*23* 76:*4* 93:*15*
94:*2* 97:*2*
projects 59:*4* 71:*24*
project's 29:*22* 46:*11*
promoted 8:*15*
promotion 16:*11*
prospect 56:*16* 57:*1, 2*
provide 87:*17*
provided 21:*7, 15, 23*
22:*7* 52:*11, 13* 53:*5*
59:*3* 68:*4* 76:*21* 88:*1,
18* 102:*1*
provision 79:*17*
provisions 76:*19*
proximal 67:*14*
pry 4:*11*
prying 6:*25*
public 61:*16*
purchase 70:*2*
purpose 28:*20*
purposes 26:*15* 103:*10,
17, 24*
pursuant 1:*12* 81:*12*
109:*3*
pursuing 57:*3*
put 32:*23* 57:*7, 17*
62:*10* 84:*4* 93:*3*
putting 24:*6*
pyramid 10:*11*

< Q >
quality 61:*11*
question 4:*11* 7:*19*
16:*24* 18:*19* 22:*18, 22*
57:*8* 59:*22* 65:*21* 67:*9*

69:*19* 70:*3, 10* 82:*16*
84:*22* 85:*14* 91:*24*
93:*21* 104:*22*
questions 6:*25* 26:*20*
50:*7* 101:*6* 102:*10*
104:*2, 5* 106:*7, 13*
quick 73:*10* 102:*11*
quickly 99:*16*
quite 11:*9*

< R >
ran 54:*19*
random 102:*18*
Randy 105:*8*
rarely 32:*22*
rate 56:*3* 102:*21, 23*
rating 103:*10, 23*
reaching 67:*23*
read 21:*9* 26:*14* 50:*21,
25* 58:*17* 70:*7* 84:*22*
86:*1* 104:*12*
ready 50:*25*
realize 104:*24*
really 6:*4* 10:*14* 16:*18*
23:*13* 37:*12* 78:*12*
reason 29:*22* 66:*11*
69:*7* 88:*17, 21* 103:*13*
recall 10:*16* 24:*2, 5*
26:*25* 27:*4, 24* 28:*2, 10,
19* 30:*9, 13, 19* 31:*6*
32:*25* 33:*9, 18* 34:*9, 10,
12, 15, 18* 35:*17* 36:*8,
10, 11, 13, 14, 25* 37:*4, 18,
22, 24* 38:*5, 7, 11, 13*
39:*8* 40:*1, 4, 8, 14, 17,
19, 22* 41:*1, 8, 14* 42:*4,
6* 44:*10* 45:*3* 47:*17*
48:*23* 49:*9* 54:*4, 18*
55:*5* 57:*14* 61:*7* 71:*5*
72:*5* 73:*8* 74:*1, 12, 14*
78:*6, 11* 82:*11* 83:*1, 4,
7, 11* 85:*3, 23* 86:*12*
88:*6, 14* 90:*11, 22*
102:*4* 104:*6, 20* 106:*23*
recalling 55:*3*
receivable 60:*1, 18*
61:*10, 17* 87:*3, 7* 89:*15*
100:*22, 24* 103:*17*
receivables 60:*15* 61:*6,
11, 12, 15, 18, 20, 25* 62:*1,
7*
received 44:*5* 58:*14*
83:*22* 98:*13*
recess 50:*12* 77:*18*
84:*16*
recollection 23:*5* 25:*23*
26:*6* 33:*15* 34:*6* 35:*17*
46:*20* 49:*17* 53:*23*
78:*13* 86:*4*
recollections 39:*24*
recommendation 87:*15*
record 4:*4* 10:*1, 3*

Case 2:13-cv-01291-LA    Filed 01/12/18    Page 39 of 42    Document 155-2

31:*12*  70:*6*
recorded  31:*14*
reduced  108:*20*
refer  106:*18*
reference  38:*20*  58:*10*
referenced  79:*3*  104:*8*
references  27:*13*  64:*24*
79:*11*
referred  19:*14*  66:*15*
referring  27:*8*  35:*20*
63:*25*  77:*6*  79:*7*  93:*22*
refers  64:*19*  65:*17*
96:*10*
reflect  59:*14*
reflected  100:*25*
reflects  80:*12*  101:*24*
refresh  25:*23*  26:*6*
53:*22*
refreshed  24:*3*
refute  88:*17*
regard  59:*2*  71:*20*  88:*8*
regarding  87:*21*
regional  9:*15, 24*  10:*6,
21*
Related  62:*13*  109:*7*
relates  14:*25*  78:*23*
88:*2*
relating  31:*7*
relation  11:*5*
relationship  42:*22*
63:*23*  65:*18*  70:*16*
72:*3, 23*  74:*4*
relationships  57:*8*
relative  17:*12*
relevance  24:*23*
relevant  66:*13*
remember  26:*15*  36:*21*
37:*25*  47:*11*  48:*8*
repatriated  9:*14*
rephrase  70:*10*
replaced  96:*11*
report  19:*5*
REPORTED  1:*24*
10:*15, 23*  108:*18*
reporting  19:*1*
represent  27:*14*
representative  18:*1*
30:*24*  89:*3*
Representing  2:*8, 16*
20:*22, 25*  41:*12*
represents  59:*14*
request  43:*15*
requested  42:*17, 18, 20*
43:*11, 12*  70:*7*  98:*14*
requests  63:*11*
required  43:*19*
re-read  70:*4*
research  55:*15, 18*
reserve  106:*8*
residence  24:*17*
resolutions  67:*19*  68:*1*

respect  5:*18*  40:*7*  43:*1*
61:*9*  62:*1*  69:*25*  70:*1,
14, 15*
respective  109:*1*
responsibilities  8:*20*
14:*24*  15:*4, 23*
responsible  75:*5*
restate  70:*3*
result  70:*16*
retention  74:*17, 21*  75:*1*
76:*11*  85:*6, 17*  86:*8, 9,
11, 14*  87:*19, 22*  88:*3,
24*  93:*2*  99:*3, 10*
100:*10*  101:*22*
retentive  105:*1*
retirement  54:*22*
reverse  80:*12*
review  21:*10*  22:*11*
26:*14*  51:*5*  58:*24*
61:*11*  68:*22*  75:*8*
82:*22*  90:*7*  98:*4, 15*
99:*19*
reviewed  60:*7*  83:*16*
85:*1*  90:*12*  102:*8*
reviewing  82:*23*  90:*11*
99:*16*  102:*4*
Richard  13:*14, 15*  14:*6,
23*  27:*3, 6, 9, 10, 14, 16,
18*  30:*12, 14*  33:*5, 6*
34:*2, 21*  42:*13*  44:*11*
45:*17*  47:*2, 8, 11*  48:*3*
50:*24*  54:*12, 14, 19*
83:*5*  105:*24*
Richard's  15:*2, 22*
Richmond  8:*24*
Rick  12:*11*  13:*12, 13,
14*  15:*16*  16:*6, 7, 10*
30:*12*  31:*14*  33:*4*
40:*19*  79:*11*  96:*2, 13, 14*
right  8:*9*  16:*9*  19:*21*
32:*13*  34:*4*  54:*23*
65:*20*  79:*9*  84:*8*  88:*12*
91:*7*  93:*19*  94:*2, 21*
97:*15, 18, 23*  103:*9*
106:*8*
rings  49:*3*
RIORDAN  2:*3*  3:*5*
4:*23*  5:*7, 23*  11:*3, 4, 7,
12*  13:*25*  18:*9*  19:*2, 10,
13, 19*  20:*6, 19, 24*  21:*3,
19, 20, 21*  22:*2, 9, 15*
24:*22*  26:*2, 7*  27:*8, 17*
45:*21*  46:*3*  50:*10*
60:*25*  63:*25*  64:*4, 18*
65:*9, 17, 20*  69:*7, 11, 19*
70:*8, 17, 21*  72:*6*  76:*14*
77:*5, 9, 12, 15*  81:*8*
83:*19, 21, 24*  84:*4, 10,
14*  85:*8*  86:*1*  90:*20*
91:*20*  92:*4*  94:*25*  95:*3*
100:*11, 14*  101:*12, 15*
102:*7*  106:*12, 15*  107:*6*

risk  14:*20*  73:*13*  97:*11*
river  71:*13*  73:*6*
ROCHE  2:*2*
role  14:*15*  15:*3*  90:*18,
23*
roles  15:*4*
Ron  54:*11*  105:*25*
Ronald  53:*15*
roughly  73:*19*
RPR  1:*24*
Rule  5:*1*  36:*20*  66:*16*
88:*1*
Rules  1:*12*  23:*2*
run-on  101:*20*
Ryan  13:*1, 19*

< S >
S.C  2:*10*
safe  95:*1*
Safeco  57:*7*  63:*13, 18,
23*  67:*1*
saw  62:*14*  74:*23*  76:*22*
78:*10*
saying  22:*19*  36:*21*
80:*15*  91:*4*
says  5:*1*  62:*14*  95:*1*
96:*9*  103:*9*  106:*17*
schedule  60:*2*
schedules  58:*25*  97:*9*
school  7:*3, 7*  25:*6*
SCHUYLER  2:*2*
SCOTT  2:*11*  64:*18*
69:*8*  81:*8*
seal  109:*11*
search  32:*12, 13*
second  30:*24*  47:*24*
81:*8*  106:*18*
secondary  98:*4*
secrets  64:*22*
section  92:*10*
see  12:*11*  29:*25*  30:*11*
38:*21*  54:*9*  59:*20*
62:*24, 25*  67:*17*  74:*25*
75:*1*  76:*25*  77:*1*  80:*4,
5*  90:*8*  92:*13*  94:*12*
100:*8*  102:*2*  103:*4, 12*
104:*17*
seeking  34:*11*  86:*6, 13*
seen  50:*19*  58:*2*  59:*20,
23*  66:*17*  68:*25*  69:*14*
78:*1, 7, 11*  82:*17, 20*
84:*23, 24*  88:*20*  104:*11,
14*
selection  90:*14*
Selke  67:*15*
senior  9:*15, 18*  10:*6*
16:*10, 14*  43:*5*
senior-most  54:*5*
sense  29:*23*  48:*25*
51:*18*  97:*14*
separate  82:*5*  85:*9*  89:*8*
series  60:*23*  102:*10*

104:*1*
serious  44:*2*
set  109:*11*
setbacks  88:*2, 9, 11, 13*
Setting  73:*22*
shalloin@halloinmurdock
.com  2:*15*
share  93:*19*
shared  25:*25*
sheet  41:*23*  89:*19*
91:*18*  101:*25*  102:*5, 21*
shelves  4:*14*
short  50:*12*  77:*18*
84:*16*
show  64:*9*
showed  91:*18*  92:*2*
showing  36:*21*
shown  92:*17*
signature  108:*24*
signed  106:*20, 24*
sign-off  96:*9*  106:*17*
sign-offs  107:*4*
sign-on  94:*13*
similar  71:*16*  74:*7*
simple  7:*1*  61:*21*  64:*7*
simply  55:*11*
single  76:*6*
Sir  4:*3*  5:*15*  50:*18*
59:*13*  66:*7*  79:*21*  106:*4*
sit  4:*14*
situation  19:*4*  41:*11*
73:*10*
size  54:*3*  71:*22*  76:*6*
Skipper  36:*5*
Smaller  9:*24*
so-and-so  36:*22*
software  32:*7*
solely  53:*9*
somebody  98:*8, 16*
Sorry  9:*7*  13:*15*  47:*5*
79:*6*  95:*18*  96:*14*
102:*11*
sort  20:*4*  24:*2*  35:*23*
63:*21*
sorts  72:*14*
sought  76:*13*  87:*16*
Sound  37:*9*  54:*10*
Sounds  37:*10*  54:*11*
source  24:*4*  51:*22*  52:*7*
53:*1*
speak  71:*4*  88:*23*
speaking  11:*19*
specific  27:*4, 24*  28:*2*
33:*15*  36:*19, 25*  38:*11*
39:*24*  46:*10, 20*  55:*5*
71:*21*  72:*12*  87:*20*
104:*19, 20, 22*
specifically  15:*14*  23:*10*
33:*18*  36:*9, 12*  40:*2, 17,
20, 23*  41:*1*  55:*3*  58:*21*
61:*7*
specifics  41:*15*  74:*12*

speculation 91:21
speed 57:9
spell 4:6 12:16
spent 8:10
spoke 36:15
spot 96:12
St 56:2, 3
staff 57:6
stage 49:25
staple 59:14
start 13:10 26:17
32:24 33:12 47:16
53:13 54:23 97:1
started 7:24 8:1 54:22
67:23
starts 46:11 101:20
state 4:3 57:16
statement 49:12 55:9,
16 56:12 57:10 62:2, 3,
6 64:19 65:17 86:23
87:5 90:11, 16 95:14,
17, 22 96:16
statements 55:20 90:8,
13 92:11 95:12 98:12
100:25
STATES 1:1, 13 67:17
108:8
status 62:18 98:2
statutory 34:2 35:1
stay 19:11 20:4
stays 97:22
stenographically 108:18
step 71:13
Stetson 1:16 2:4 108:6
Steve 33:25 34:22, 24
41:11 44:16 45:18
105:25
Steven 30:22 40:22
stood 41:13
straight 68:11
stream 52:6
Street 2:12 5:19 6:14
13:9 14:5 19:7 28:23
29:6, 7 38:4, 15 42:1, 2
45:1, 7, 10 46:2, 10
47:9, 15 48:18 56:23
79:23 91:11 93:15
94:2 97:2 99:20 103:22
stretch 50:5
strike 44:21
strikes 61:21
studied 7:5
subdivision 19:16
subject 22:16, 19
subjects 38:1, 1
substantial 56:3
suggest 50:4
suit 109:8
Suite 2:4, 12
sum 45:14
summary 89:19 91:18
summer 29:5

superintendent 33:9
36:15 37:2, 3, 16 39:13
48:18
supervise 11:16, 18
supervised 10:15 11:23
12:2, 9
Supervision 53:21
supervisor 10:12 53:19,
24
supervisors 13:22
support 62:23 63:7
71:14 72:13 73:14, 25
74:3 76:4 81:3
sure 11:9 12:22 15:10,
20 32:20 49:3 50:10
54:7, 15 65:22 70:12,
24 82:21 83:21 93:1, 22
99:20 104:2
Surety 9:20, 21 11:15
14:21 56:2 68:5 72:13
73:25
surprise 83:15, 17
surprised 54:17, 24
switching 94:3
sworn 4:2 5:11 108:15
system 95:9

< T >

take 15:1 17:1 28:8
31:15 32:17 33:19
50:5, 24 59:19 82:22
93:24
taken 1:15 50:13 77:19
84:17
takes 47:8
talk 19:6 23:15, 19
24:10 33:10 41:10
talked 19:6 22:25 23:8
58:4 76:1
talking 36:17, 19 64:5
65:9, 10 70:23, 25 71:5
91:6 94:4
talks 101:8
tangent 33:19
Tangible 101:22
TANNEHILL 1:15, 24
108:3 109:16
team 49:19
telephone 49:23
tell 4:12 7:2 8:18
10:10 11:21 17:4
19:14 20:2 22:16
28:25 35:11 38:1 44:2
50:25 66:7 67:13 74:5
93:13 95:8 96:3 105:2,
5, 8, 11, 14, 17, 20, 24
telling 30:8
tend 32:23
term 102:17
terms 14:17 66:20
71:16, 22 73:16, 17
74:6, 11 76:5, 7 85:5
87:21 88:19, 23 91:6

93:25 100:11 104:7, 9
105:3, 6, 9, 12, 15, 18, 21
106:1
territory 9:17
testified 5:11 23:4 72:1,
2 76:21 78:15
testify 5:6 24:5 108:15
testifying 22:8 82:24
testimony 23:5 35:13
45:22 72:7 79:4, 5
88:1, 18 90:10 108:17,
23 109:10
Thank 50:11 106:6, 10
107:6, 7
thereof 109:9
thing 39:23 44:6, 19
things 19:23 30:3
39:24 52:1 53:12
63:10 97:7
think 10:7, 17 15:9
16:17 17:11 20:20
22:5, 13 26:21 27:8
29:4 30:3 31:4 33:2, 9
36:23 45:22 46:21
54:21 65:5, 14 73:10,
19 77:10, 13 84:7
85:22 91:5
thinking 27:3
third 18:5 32:20 48:1
101:19
this, 23:4 36:23
Thomas 94:12
thorough 54:25
thought 49:1 50:24
69:11 101:12
thread 37:1
three 7:23 17:3, 8
19:22 32:4, 17 45:11
60:11 62:16 65:8
67:17, 18, 25 68:1 84:5
90:7 104:5
tie 47:12
Till 9:3
time 8:8, 23 10:5, 11, 17,
25 11:7 12:8, 21, 23, 24
16:23 24:21 25:10, 21
27:11 29:19 34:1
35:19 37:7, 17 39:10
50:22 55:1 60:25 61:2
67:22 72:21 73:16
78:10 82:22 90:24
95:24 96:24 104:12
106:6
timeline 94:8, 10
times 16:21 17:2
title 8:21 43:6, 8
titles 8:18 16:13
today 20:9, 17 24:5
25:23 60:25 78:8
106:11
told 89:6 104:9
Tom 12:11, 18 13:10,
12 14:19 15:2, 5, 12, 14,

22 16:4, 23 23:9 37:6,
21, 22 46:25 47:1, 1, 3,
6, 7 48:12, 14, 22, 23
49:2, 9 53:25 54:1, 12,
12 57:2 71:4 75:7, 22
83:2 85:10 87:15, 15,
20 92:22 93:4 96:11,
16, 21 104:7 105:25
106:19
Tom's 14:14 15:7 75:22
Tony 12:12, 13, 18 13:18
top 58:18
topic 77:24
topics 36:18
Toronto 9:11
total 14:3 19:22 45:14
61:23 103:9, 23
touch 51:12
touching 46:9
to-wit 108:4
track 4:16 31:17
transcript 3:23, 23
83:23 108:22
Transcription 108:21
transfer 66:11
transferred 8:24
treat 8:13
trends 61:25
trial 4:17 36:21
trick 93:21
triggered 99:22
triggering 43:14 99:11
TRUCKING 1:8 6:9,
20 14:8 62:15 79:19
80:1, 3
Trucking, 67:19
true 5:15 13:18 57:10
108:22
truth 108:15, 16, 16
try 61:24, 25 71:16
72:3 79:1
trying 10:16 21:16
22:6 23:1, 7 24:1
26:15, 22 28:25 36:20
38:21 46:19 47:12, 13
48:7 51:19 52:23 65:4
66:12, 15 71:23 72:9,
20 75:14 84:4 91:4
96:24
turnover 87:9
twice 17:11, 11
two 7:23 13:10, 12
17:3, 8 19:16, 18, 19
20:14, 14 28:4, 8 32:19,
19 37:6, 19 39:20 40:6,
9, 14 46:9 54:5 67:14
84:5 85:9
type 43:24 49:24 51:23
63:16, 21 97:7
types 35:8 52:1 71:24
typewriting 108:20

< U >

Uh-huh 11:2 25:4 58:9
84:9 94:14 100:13
ultimate 48:17
ultimately 70:15 72:18
93:3, 9 103:21
unacceptable 105:3, 6, 9,
12, 15, 18, 22 106:2
uncomfortable 73:21
undergraduate 7:8
underlying 51:24 90:4
underneath 103:9
understand 14:14 46:6
80:14 91:25
understanding 55:21, 24
56:5 63:19 65:11
70:19 71:19 73:15
74:10, 20
understands 65:22
understood 45:23
undertake 63:21
underwrite 60:8 62:5
underwriter 6:6 8:22
9:4 14:16 16:12 51:9
89:24 96:9 103:1
106:17
Underwriters 11:25
12:9 16:13
underwriting 5:4, 17, 21,
25 6:11, 13 13:7 14:4,
9 15:1 17:23 19:3, 5
21:3 28:21, 22 29:14
31:9 44:23, 24 45:6, 8,
25 46:9, 14, 18, 25 49:6,
14, 25 51:4 52:9 57:6,
8 59:7 60:22, 23 61:3
62:8 64:5 67:2 68:9
70:25 71:2, 3 72:22
75:4 76:4 86:25 91:13,
15 92:6, 23 94:4, 13
97:19 101:5 106:20
107:3
underwritten 43:25
91:17 92:1, 19
undetermined 108:8
unidentified 40:25
UNITED 1:1, 13 108:8
unnamed 42:15 44:13
45:18 48:6 53:14
unsigned 67:7
untrue 39:10, 14, 17
42:8, 11
unusual 28:5
update 98:6 101:21
use 61:10 84:2 102:23
usually 20:2
utilizes 43:9

< V >
Vanderbloemen 30:22,
23 34:1, 22, 25 35:10
40:22 44:17 45:18
106:1

variance 96:23
variety 61:4
Venture 36:6
verify 65:4 77:4
versa 48:9 80:20
version 95:10
versus 24:2
vice 9:15, 19 10:6 43:5
48:9, 14 80:20
violated 100:10
Virginia 8:25
vis-a-vis 15:23
voicemail 49:23
voluntarily 43:21
vs 1:5

< W >
waived 108:25
want 11:20 18:24
19:25 25:8 35:12
62:12 65:21 76:6
84:13 100:1
wanted 38:9 70:14
86:10 91:5 92:24
wants 98:1
water 29:8
Wausau 67:1
way 23:24 38:6 78:3
83:23 96:3 109:7, 8
Weber 13:1
weighed 37:7
Well 7:25 14:25 16:12
23:22 26:17 30:11
43:8 52:3 64:17 65:9,
10 66:2, 25 71:21 72:1
74:23 75:22 88:10
90:23 91:12, 15 92:10
93:2 94:20 95:11
98:24 99:7
went 7:2, 7 8:9 9:14
44:23, 24
We're 11:19 20:20
52:24 66:14 73:1
84:14 94:7 101:3, 5
104:1, 25, 25 106:10
West 79:23
wet 7:20
we've 41:4 45:9 51:12
63:11 98:13
WHEREOF 109:10
wife 28:6, 10 47:20
WISCONSIN 1:2, 6, 8
2:13 35:4 57:6 79:23
108:9
withheld 89:7
WITNESS 3:2 4:1, 5, 8,
18 5:10, 25 17:13, 20,
22 18:7 19:17, 18, 21
20:23 22:7, 22 23:2
25:1 27:10 65:22
69:22 70:9, 24 76:15
85:10 86:2 90:22
91:21 92:5 95:4

100:19 102:8 106:5
108:14, 18, 19, 23
witnesses 5:2
woman 48:9
woman-owned 62:18
word 32:12 56:21
88:10
words 72:10 80:22
99:22
work 13:7 23:2 58:17
74:22
work, 62:19
worked 7:23 14:12
18:9 74:24
working 16:5, 8 24:12
47:1, 3, 7 98:21
work-in-progress 58:25
works 11:10
worried 62:19
worth 23:11 74:17, 21
75:1 85:6, 17 86:8, 9,
11, 13 87:19, 22 88:2,
24 90:14, 19 91:18
92:2, 14, 17 93:2, 13
99:3, 9, 21 100:9, 16
101:23 103:3, 10, 23
Wow 8:7
write 73:12 87:16
written 97:22 101:9
wrong 23:25 39:2, 3
wrote 15:6 57:16

< Y >
Yeah 5:24 16:7 17:24
18:20 19:19 20:6, 24
25:2 29:20 33:7, 23
36:25 46:3 51:2 54:14
61:19 71:2, 23 73:5
77:9, 13 80:10 94:6
95:1, 16, 19
year 15:17 25:7 29:2
90:21, 21 103:4
year-end 101:25
years 4:15 7:4 23:7
25:5 36:24 92:15
96:23 97:14
Yesterday 20:12 78:9
82:19, 20 83:25 85:2

< Z >
Zirbel 30:16, 17 33:6
34:3, 21 36:3, 12 39:9
40:19 42:13 44:11
45:17 48:3 54:13, 14
55:6 105:24
Zurich 42:18, 22, 24
43:2, 5, 8, 8, 12 101:10